[PHILADELPHIA, MAY 8TH, 1839.]

## THE COMMONWEALTH *against* GREEN and Others.*

QUO WARRANTO.

1. The General Assembly of the Presbyterian church is not a *quasi* corporation. A *quasi* corporation has capacity to sue and be sued, as an artificial person, which the General Assembly has not. It is also established by law, which the General Assembly is not. Neither does the General Assembly bear the same relation to the corporation of the Trustees of the General Assembly, &c. as the shareholders do to a bank or joint-stock company; for the latter are an integrant part of the body. The General Assembly is a segregated association, which, though it is the re-productive organ of corporate succession, is not itself a member of the body.

2. The General Assembly having no corporate quality in itself, it is not a subject of the Court's corrective jurisdiction, or of the Court's scrutiny, further than to ascertain how far its organic structure may bear on the question of its personal identity or individuality.

3. The acts of the General Assembly of 1837, exscinding the synods of Utica, Genessee, Geneva and the Western Reserve, were nothing more than ordinances of dissolution.

4. The plan of union of 1801, between the Congregational and Presbyterian churches, was a mere temporary expedient, and therefore acquired the force of a law without the ratification of the presbyteries. It could be constitutionally repealed by an ordinary act of legislation; and those synods which had their root in it could not be expected to survive it.

5. A permanent amalgamation of Congregational and Presbyterian churches, would compromise a principle at the very root of Presbyterian government, which requires that the officers of the church be set apart by special ordination for the work.

6. The General Assembly is a homogeneous body, uniting in itself, without separation of parts, the legislative, executive, and judicial functions of the government.

7. The four synods could not have been proceeded against judicially, for they had committed no offence. The plan of union, according to its true construction, admitted mixed churches, partly Congregational and partly Presbyterian, into the Presbyterian system, and authorized them to send unordained lay delegates to the presbyteries. Had the synods been judicially prosecuted for this relaxation, they could have pleaded the plan of union as a defence.

8. These acts of excision did not exclude the Presbyterian parts of the four synods from the church; provision being made for them, by allowing them to attach themselves to the nearest presbytery.

9. It is immaterial to inquire into the fact whether the four synods had actually been constituted on the plan of Union. If the General Assembly proceeded in good faith, the validity of its enactment cannot depend on the justness of its conclusion. This Court has no power to re-judge its judgments.

* I am indebted for the report of this case to F. W. Hubbell, Esq.—REP.

(The Commonwealth *v.* Green.)

10. As the synods in question were constitutionally dissolved, the presbyteries of which they had been composed, were, at least for the purpose of representation, dissolved along with them; for no presbytery can be in connexion with the General Assembly, unless it be at the same time subordinate to a synod. The commissioners from the exscinded synods, were not, therefore, entitled to seats in the General Assembly.

11. But even if they were entitled to seats, the refusal of an appeal from the decision of the moderator, would be no ground for the degradation of that officer at the call of a minority; nor could it impose on the majority an obligation to vote on a question put unofficially, and out of the usual course.

12. When a question is put by the established organ, silence is acquiescence with the majority, because each member is supposed to have assented before-hand to the process pre-established to ascertain the general will; but this rule of implied assent is inapplicable to a measure which is essentially revolutionary, and based on no pre-established process of ascertainment whatever.

13. To affect silent members with an implication of assent, the ground of the motion, and the nature of the question must be so explicitly put before them, as to prevent misconception or mistake.

14. The moderator of the preceding year, presiding under the provision of the constitution during the organization of the succeeding year, is a mere mechanical instrument of organization, and not at all subject to the control of the General Assembly.

15. If he were corporeally present, but refused to perform his functions, he might be deemed constructively absent, insomuch that the commissioners might proceed to the choice of a substitute; but not if he had entered on the performance of his task.

16. A motion to put upon the roll the names of the commissioners from the four synods, made before the body was sitting, under the presidency of its own moderator, was premature. Such questions are proper for the decision of the body when it is fully constituted and prepared for organization.

17. The title of the commissioners from the exscinded synods, could be determined only by the action of the house, which could not be had before its organization was complete. In the mean time the moderator was bound, as the executive instrument of the preceding assembly, to put its ordinances in execution; for to the actual assembly, and not to the moderator of the preceding one, it belonged to repeal it.

THIS was a quo warranto issued by this Court under the act of the 14th of June, 1836. The suggestion and other pleadings were in the following words.

" City and county of Philadelphia, ss.

James Tod, John R. Neff, Frederick A. Raybold, George W. M'Clelland, William Darling, and Thomas Fleming, who sue for the commonwealth in this behalf, come here into the Supreme Court for the Eastern District of Pennsylvania, and for the said commonwealth give the Court here to understand and be informed, that Ashbel Green, William Latta, Thomas Bradford, Solomon Allen, and Cornelius C. Cuyler, all of the city and county of Philadelphia, since the twenty-fourth day of May, in the year of our Lord one thousand eight hundred and thirty-eight, have exercised and do still exercise the franchises and privileges of corporators, within the said city and county, without lawful authority, namely, the franchises and privileges of trustees of a certain corporation, called and known by the name of Trustees of the General Assembly

of the Presbyterian Church in the United States of America : That on the day and year last aforesaid, the above-named James Tod, John R. Neff, Frederick A. Raybold, George W. M'Clelland, William Darling, and Thomas Fleming, were in due and regular form of law, elected trustees of the said corporation, by the General Assembly of the Presbyterian Church in the United States of America, agreeably to the provisions of an act of assembly, passed on the twenty-eighth day of March, in the year of our Lord one thousand seven hundred and ninety-nine, entitled, An act for incorporating the trustees of the Ministers and Elders constituting the General Assembly of the Presbyterian Church in the United States of America, but notwithstanding the said election, they the said Ashbel Green, William Latta, Thomas Bradford, Solomon Allen, and Cornelius C. Cuyler, have for the time aforesaid used, and still do use the franchises, offices, privileges, and liberties aforesaid, and during the said time have usurped and do usurp upon the commonwealth therein, to the great damage and prejudice of the constitution. and laws thereof. Whereupon the said relators for the said commonwealth, do make suggestion and complaint of the premises, and pray due process of law against the said Ashbel Green, William Latta, Thomas Bradford, Solomon Allen, and Cornelius C. Cuyler, in this behalf to be made, to answer to the said commonwealth by what warrant they claim to have, use and enjoy the franchises and privileges aforesaid."

" And now, this thirty-first day of July, in the year of our Lord one thousand eight hundred and thirty-eight, comes the said Ashbel Green, by John K. Kane, his attorney, and protesting that the suggestion filed in this case, is altogether insufficient in law, and that he need not, according to the law of the land, to make answer thereunto ; nevertheless, for a plea in this behalf he saith, that the said commonwealth ought not to implead him by reason of the premises in the said suggestion set forth, because he saith, that by the first section of an act of assembly of this commonwealth, passed the twenty-eighth day of March, A. D. 1799, entitled An act for incorporating the trustees of the Ministers and Elders constituting the General Assembly of the Presbyterian Church in the United States of America, this defendant and certain other citizens of this commonwealth, were made, declared and constituted a corporation and body politic and corporate in law and in fact to have continuance forever, by the name, style and title of Trustees of the General Assembly of the Presbyterian Church, in the United States of America ; by force of which said act of assembly, he saith that he became lawfully authorised and entitled to exercise with his associates, in that behalf lawfully constituted, the office of one of the trustees of the General Assembly of the Presbyterian Church in the United States of America, and the franchises, liberties and privileges

thereunto belonging and appertaining, within the city and county of Philadelphia. And he further in fact saith, that he did thereupon accept and take upon himself the said office, and that he hath ever since and as well after as before the twenty-fourth day of May, A. D. 1838, exercised and continued to exercise the same in the city and county of Philadelphia, by virtue of the said act of assembly of this commonwealth; all which he is ready to verify, without this, that on the twenty-fourth day of May, A. D. 1838, or at any other time before or since, the relators or any of them were in due and regular form of law elected trustees of the General Assembly of the Presbyterian Church in the United States of America, as they have suggested to this honourable Court. And without this, that by reason of any matter or thing whatsoever, the said office of this defendant and his right to have, exercise and enjoy the same together with the liberties, franchises and privileges thereunto belonging and appertaining, have been in any wise vacated, determined or abridged. Wherefore, this defendant prays judgment, and that the office, liberties, franchises and privileges, by him herein claimed as aforesaid, may be adjudged and allowed."

" And now, this thirty-first day of July, in the year of our Lord one thousand eight hundred and thirty-eight, the said Thomas Bradford, one of the above-named defendants, in his proper person comes, and protesting that the suggestion filed in this case, is altogether insufficient in law, and that he need not, according to the laws of the land, to make answer thereto; nevertheless, for a plea in this behalf he saith, that the commonwealth ought not to implead him, by reason of the premises in the said suggestion set forth, because he saith, that on the twenty-seventh day of May, A. D. 1832, the General Assembly of the Presbyterian Church in the United States of America, then holding its session in the state of Pennsylvania, to wit, in the city of Philadelphia, *did,* according to the provisions of an act of assembly of this commonwealth, passed the twenty-eighth day of March, A. D. 1799, entitled " An act for incorporating the Trustees of the Ministers and Elders constituting the General Assembly of the Presbyterian Church in the United States of America," in due and regular form of law, elect, constitute and appoint him the defendant, to be one of the trustees of the General Assembly of the Presbyterian Church of the United States of America, by force of which election and appointment so made as aforesaid, he saith that he became lawfully authorised and entitled to take upon himself, and with his associates in that behalf lawfully constituted, to exercise and enjoy the office of one of the trustees of the General Assembly of the Presbyterian Church in the United States of America, and the franchises, liberties and privileges thereunto belonging and appertaining within the city and county of Philadelphia. And he further in fact saith, that he did thereupon

accept and take upon himself the said office, and that he hath' ever since, and as well after as before the twenty-fourth day of May, A. D..1838, exercised and continued to exercise the same in the city and county of Philadelphia, by virtue of the authority so to him granted by the said election and appointment, and by virtue of the said act of assembly of this commonwealth, all which he is ready to verify. Without this, that on the twenty-fourth day of May, A. D. 1838, or at any other time, before or since, the said relators or any of them were in due and regular form of law elected trustees of the General Assembly of the Presbyterian Church in the United States of America, as they have suggested to this honourable Court; and without this, that by reason of any matter or thing whatsoever, the said office of him, this defendant, and his right to have, exercise and enjoy the same, together with the franchises, liberties and privileges thereunto belonging and appertaining, have been in any wise vacated, determined or abridged. Wherefore this defendant prays judgment, and that the office, franchises, liberties and privileges by him herein claimed as aforesaid, may be adjudged and allowed to him, and that he may be dismissed and discharged by the Court here, of and from the premises above charged upon him, &c."

" And the said relators, who prosecute for the commonwealth in this behalf, having heard the plea of the said Ashbel Green, in manner and form aforesaid, above pleaded in bar to the said suggestion for the said commonwealth, say, that by any thing in that plea alleged the said commonwealth ought not to be barred from having the said suggestion against the said Ashbel, because protesting that the said plea and the matters therein contained, are not sufficient in law to bar the said commonwealth from having the aforesaid suggestion against the said Ashbel, to which said plea in manner and form above pleaded, the said relators are under no necessity, nor any ways obliged by the law of the land to answer; for replication, nevertheless, the said relators say, that by the said act of assembly of this commonwealth, in the said plea above mentioned and referred to, it was among other things enacted, that the said Ashbel Green and seventeen other persons in the said act named, and their successors duly elected and appointed in manner as is thereinafter directed, should be, and they were thereby made, declared and constituted a corporation and body politic and corporate in law and in fact, to have continuance forever, by the name, style and title of Trustees of the General Assembly of the Presbyterian Church in the United States of America, and that the said corporation and their succesors, by the name, style and title aforesaid, should be able and capable in law all and every other matter and thing to do in as full and effectual a manner as any other person, bodies politic or corporate, within this commonwealth might or could do, and that the said corporation should not at any time

(The Commonwealth *v.* Green.)

consist of more than eighteen person, whereof the said General Assembly, might at their discretion, as often as they should hold their sessions in the state of Pennsylvania, change one-third in such manner as to the said General Assembly should seem proper, which said act of assembly, the persons named therein afterwards, to wit, on the said twenty-eighth day of March, in the year one thousand seven hundred and ninety-nine accepted, to wit, at the city and county aforesaid. And the said relators in fact say, that on the seventeenth day of May, in the year one thousand eight hundred and thirty-eight, the said General Assembly commenced and held a session at the city of Philadelphia, in the state of Pennsylvania, to wit, at the city and county aforesaid, and thenceforth continued to hold the same there for a long space of time, and that during the last mentioned session thereof, to wit, on the twenty-fourth day of May, in the year last aforesaid, the said General Assembly in pursuance of the provisions of the said act of assembly, and in the due and lawful exercise of the power and authority thereby conferred upon them, to change the said trustees as therein mentioned, chose the said James Tod to be one of the trustees of the General Assembly of the Presbyterian Church in the United States of America, in the place of the said Ashbel Green, and he the said James Tod was thereby then and there in due manner elected and appointed one of the said trustees as aforesaid, in the place of the said Ashbel Green, and the said James Tod then and there accepted and took upon himself the said office, and the said General Assembly thereby then and there amoved, disfranchised and discharged the said Ashbel Green, of and from the office of one of the trustees of the General Assembly of the Presbyterian church in the United States of America, and of and from the franchises, liberties and privileges thereunto belonging and appertaining; all and singular which said matters and things the said relators are ready to verify and prove as the court shall award; wherefore they pray judgment, and that the said Ashbel may be convicted of the premises above charged upon him, and that he may be ousted and altogether excluded from the said office of one of the trustees of the General Assembly of the Presbyterian Church in the United States of America, so by him claimed in manner aforesaid, &c."

"And the said relators, who prosecute for the commonwealth in this behalf, having heard the plea of the said Thomas Bradford, in manner and form aforesaid, above pleaded in bar to the said suggestion for the said commonwealth, say, that by any thing in that plea alleged the said commonwealth ought not to be barred from having the said suggestion against the said Thomas, because protesting that the said plea and the matters therein contained, are not sufficient in law to bar the said commonwealth from having the aforesaid suggestion against the said Thomas, to which said plea in manner and form above pleaded, the said relators are under no necessity, nor any ways

(The Commonwealth v. Green.)

obliged by the law of the land to answer; for replication, nevertheless, the said relators say, that by the said act of assembly of this commonwealth, in the said plea above mentioned and referred to, it was among other things enacted, that the said Ashbel Green and seventeen other persons in the said act named, and their successors duly elected and appointed in manner as is thereinafter directed, should be and they are thereby made, declared and constituted a corporation and body politic and corporate in law and in fact, to have continuance forever, by the name, style and title of Trustees of the General Assembly of the Presbyterian Church in the United States of America, and that the said corporation and their successors, by the name, style and title aforesaid, should be able and capable in law, all and every matter and thing to do in as full and effectual a manner as any other person, bodies politic or corporate within this commonwealth, might or could do, and that the said corporation should not at any time consist of more than eighteen persons, whereof the said General Assemby might at their discretion, as often as they should hold their sessions in the state of Pennsylvania, change one-third in such manner as to the said General Assembly should seem proper, which said act of assembly, the persons therein named, afterwards, to wit, on the said twenty-eighth day of March, in the year one thousand seven hundred and ninety nine, accepted, to wit, at the city and county aforesaid. And the said relators in fact say, that afterwards, to wit, on the seventeenth day of May in the year one thousand eight hundred and thirty-eight, the said General Assembly commenced and held a session at the city of Philadelphia, in the state of Pennsylvania, to wit, at the city and county aforesaid, and thenceforth continued to hold the same there for a long space of time, and that during the said last mentioned session thereof, to wit, on the twenty fourth day of May in the year last aforesaid, the said General Assembly in pursuance of the provisions of the said act of assembly, and in the due and lawful exercise of the power and authority thereby conferred upon them to change the said trustees as therein mentioned, elected and appointed the said George W. M'Clelland to be one of the trustees of the General Assembly of the Presbyterian church in the United States of America, in the place of the said Thomas Bradford, and he the said George W. M'Clelland was thereby then and there in due manner elected and appointed one of the said trustees as aforesaid, in the place of the said Thomas Bradford, and the said George W. M'Clelland, then and there accepted and took upon himself the said office, and the said General Assembly thereby then and there amoved, disfranchised and discharged the said Thomas Bradford, of and from the office of one of the trustees of the General Assembly of the Presbyterian church in the United States of America, and of and from the franchises, liberties and privileges thereunto belonging and appertaining, all and singular which said

(The Commonwealth *v.* Green.)

matters and things the said relators are ready to verify and prove as the Court shall award. Wherefore they pray judgment, and that the said Thomas Bradford may be convicted of the premises above charged upon him, and that he may be ousted and altogether excluded from the said office of one of the trustees of the General Assembly of the Presbyterian church in the United States of America, so by him claimed in manner aforesaid, &c."

" And the said Ashbel Green, protesting that the said plea of the said relators, &c. in manner and form aforesaid, made and pleaded in reply, and the matters therein contained, are not sufficient in law, &c. and that he need not, nor is he obliged by the law of the land to answer thereto, yet the said Ashbel Green, for a rejoinder to the replication of the said relators, saith, that the General Assembly of the Presbyterian church in the United States of America, did not choose the said James Tod to be one of the trustees of the General Assembly of the Presbyterian church in the United States of America, in the place of the said Ashbel Green, nor was the said James Tod in due manner elected and appointed one of the trustees as aforesaid, in the place of the said Ashbel Green, nor did the said General Assembly amove, disfranchise, and discharge the said Ashbel Green, of and from the office of one of the trustees of the General Assembly of the Presbyterian church in the United States of America, nor of and from the franchises, liberties and privileges thereunto belonging and appertaining in manner and form as the said relators have in their said replication alleged, and of this, he the said Ashbel Green puts himself upon the country, wherefore this defendant prays judgment, &c."

" And the said Thomas Bradford, protesting that the said plea of the said relators, &c., in manner and form aforesaid, made and pleaded in reply, and the matters therein contained are not sufficient in law, &c. and that he need not, nor is he obliged by the law of the land to answer thereto, yet the said Thomas Bradford, for a rejoinder to the replication of the said relators saith, that the General Assembly of the Presbyterian church, in the United States of America, did not elect and appoint the said George W. M'Clelland to be one of the trustees of the General Assembly of the Presbyterian church in the United States of America, in the place of the said Thomas Bradford; nor was the said George W. M'Clelland in due manner elected and appointed one of the said trustees in the place of the said Thomas Bradford, nor did the said General Assembly thereby then and there amove, disfranchise and discharge the said Thomas Bradford of and from the office of one of the trustees of the General Assembly of the Presbyterian church in the United States of America, nor of and from the franchises, liberties, and privileges thereunto belonging and appertaining, in manner and form as the said relators have in their said replication alleged,

and of this, he the said Thomas Bradford puts himself upon the country, &c., wherefore the said defendant prays judgment, &c."

The defendant, William Latta, was not served with the process. Cornelius C. Cuyler and Solomon Allen put in similar pleas and rejoinders; and the relators entered the similiter to all these rejoinders.

Upon the issues so joined, the case came on for trial before Mr. Justice ROGERS and a special jury, at the Nisi Prius for Philadelphia, on the 4th day of March, 1839.

The relators, to sustain the issue on their part, gave in evidence the following act of the General Assembly of the commonwealth of Pennsylvania, viz.

" An act to incorporate the trustees of the ministers and elders, constituting the General Assembly of the Presbyterian church in the United States of America.

Whereas the ministers and elders forming the General Assembly of the Presbyterian church of the United States of America, consisting of citizens of the state of Pennsylvania, and of others of the United States of America aforesaid, have by their petition represented, that by donations, bequests or otherwise, of charitably disposed persons, they are possessed of moneys for benevolent and pious purposes, and the said ministers and elders have reason to expect farther contributions for similar uses; but from the scattered situation of the said ministers and elders, and other causes, the said ministers and elders find it extremely difficult to manage the said funds in the way best calculated to answer the intention of the donors: Therefore,

Sec. 1. Be it enacted by the Senate and House of Representatives of the Commonwealth of Pennsylvania, in General Assembly met, and it is hereby enacted by the authority of the same, that John Rogers, Alexander M'Whorter, Samuel Stanhope Smith, Ashbel Green, William M. Tennant, Patrick Allison, Nathan Irvin, Joseph Clark, Andrew Hunter, Jared Ingersoll, Robert Ralston, Jonathan R. Smith, Andrew Bayard, Elias Boudinot, John Nelson, Ebenezer Hazard, David Jackson, and Robert Smith, merchant, and their successors duly elected and appointed, in manner as is hereinafter directed, be, and they are hereby made, declared and constituted, a corporation and body politic and corporate, in law and in fact, to have continuance forever, by the name, style, and title of " Trustees of the General Assembly of the Presbyterian church in the United States of America;" and by the name, style, and title aforesaid, shall, forever hereafter, be persons able and capable in law as well to take, receive and hold, all and all manner of lands, tenements, rents, annuities, franchises, and other hereditaments, which at any

(The Commonwealth *v*. Green.)

time or times heretofore have been granted, bargained, sold, enfeoffed, released, devised, or otherwise conveyed, to the said ministers and elders of the General Assembly of the Presbyterian church of the United States, or any other person or persons, to their use, or in trust for them; and the same lands, tenements, rents, annuities, liberties, franchises, and other hereditaments, are hereby vested and established in the said corporation, and their successors forever, according to the original use and intent for which such devises, gifts and grants were respectively made; and the said corporation and their successors, are hereby declared to be seized and possessed of such estate and estates therein, as in and by the respective grants, bargains, sales, enfeoffments, releases, devises and other conveyances thereof, is, or are declared, limited and expressed; also, that the said corporation and their successors, at all times hereafter, shall be capable and able to purchase, have, receive, take, hold, and enjoy, in fee simple, or of lesser estate or estates, any lands, tenements, rents, annuities, franchises and other hereditaments, by the gift, grant, bargain, sale, alienation, enfeoffment, release, confirmation or devise, of any person or persons, bodies politic and corporate, capable and able to make the same: And further, that the said ministers and elders, under the corporate name aforesaid, and their successors, may take and receive any sum or sums of money, and any portion of goods and chattels, that have been given to the said ministers and elders, or that hereafter shall be given, sold, leased, or bequeathed to the said corporation, by any person or persons, bodies politic or corporate, that is able or capable to make a gift, sale, bequest, or other disposal of the same; such money, goods, or chattels, to be laid out and disposed of, for the use and benefit of the aforesaid corporation, agreeably to the intention of the donors, and according to the objects, articles and condition of this act.

Sec. 2. And be it further enacted by the authority aforesaid, That no misnomer of the said corporation and their successors, shall defeat or annul any gift, grant, devise or bequest, to or from the said corporation, provided the intent of the party or parties shall sufficiently appear upon the face of the gift, will, grant or other writing, whereby any estate or interest was intended to pass to or from the said corporation.

Sec. 3. And be it further enacted by the authority aforesaid, That the said corporation and their successors, shall have full power and authority to make, have and use, one common seal, with such devise and inscription as they shall think fit and proper; and the same to break, alter and renew, at their pleasure.

Sec. 4. And be it further enacted by the authority aforesaid, That the said corporation and their successors, by the name, style and title aforesaid, shall be able and capable in law, to sue and be sued, plead and be impleaded, in any court, or before any judge or justice, in all and all manner of suits, complaints, pleas, matters and

(The Commonwealth v. Green.)

demands, of whatsoever nature, kind and form they may be ; and all and every matter and thing to do, in as full and effectual a manner, as any other person, bodies politic or corporate, within this commonwealth, may or can do.

Sec. 5. And be it further enacted by the authority aforesaid, That the said corporation and their successors, shall be, and hereby are authorized and empowered to make, ordain and establish by-laws and ordinances, and do every thing incident and needful for the support and due government of the said corporation, and managing the funds and revenues thereof: *Provided*, the said by-laws be not repugnant to the constitution and laws of the United States, to the constitution and laws of this commonwealth, or to this act.

Sec. 6. And be it further enacted by the authority aforesaid, That the said corporation shall not at any time, consist of more than eighteen persons : whereof the said General Assembly may, at their discretion, as often as they shall hold their sessions in the state of Pennsylvania, change one-third, in such manner as to the said General Assembly shall seem proper. And the corporation aforesaid, shall have power and authority to manage and dispose of all moneys, goods, chattels, lands, tenements and hereditaments, and other estate whatsoever, committed to their care and trust by the said General Assembly, but in cases where special instructions, for the management and disposal thereof, shall be given by the said General Assembly in writing, under the hand of their clerk, it shall be the duty of the said corporation, to act according to such instructions : *Provided*, the said instructions shall not be repugnant to the constitution and laws of the United States, or to the constitution and laws of this commonwealth, or to the provisions and restrictions in this act contained."

Sec. 7, 8, 9 and 10, relate to the proceedings and powers of the said corporation.

The plaintiffs then gave in evidence the constitution of the Presbyterian church, with the form of government and discipline, as amended and ratified by the General Assembly in May, 1821, and the report of the committee as to the ratification of the amendments, from the Assembly's minutes of 1821. (p. 5.)

They particularly relied on the following portions of that constitution.

Chap. X. Of the Presbytery.    Sec. 2. " A presbytery consists of all the ministers, with one ruling elder from each congregation within a certain district."   (p. 357.)

Sec. 7.  " Any three ministers, and as many elders as may be present, belonging to the presbytery, being met at the time and place appointed, shall be a quorum competent to proceed to business."   (p. 358.)

Chap. XI. Of the Synod. Sec. 1. " As a presbytery is a convention of the bishops and. elders within a certain district; so a synod is a convention of the bishops and elders within a larger district, including at least three presbyteries."

" The ratio of the representation of elders in the synod is the same as in the presbytery." (p. 361.)

Sec. 2. " Any seven ministers belonging to the synod, who shall convene at the time and place of meeting, with as many elders as may be present, shall be a quorum to transact synodical business; provided not more than three of the said ministers belong to one presbytery." (Page 362.)

Chap. XII. Of the General Assembly. Sec. 1. " The General Assembly is the highest judicatory of the Presbyterian Church. It shall represent in one body, all the particular churches of this denomination; and shall bear the title of The General Assembly of the Presbyterian Church in the United States of America." (p. 363.)

Sec. 2. " The General Assembly shall consist of an equal delegation of bishops and elders from each presbytery, in the following proportion, viz; each presbytery consisting of not more than twenty-four ministers, shall send one minister and one elder; and each presbytery consisting of more than twenty-four ministers shall send two ministers and two elders; and in the like proportion for every twenty-four ministers in any presbytery; and these delegates so appointed shall be styled, Commissioners to the General Assembly."

Sec. 3. " Any fourteen or more of these commissioners, one-half of whom shall be ministers, being met on the day, and at the place appointed, shall be a quorum for the transaction of business." (p. 364.)

They also gave in evidence a certain resolution of the General Assembly of the Presbyterian Church for the year 1837, which is in these words.

" But as the ' Plan of Union' adopted for the new settlements in 1801, was originally an unconstitutional act on the part of that assembly—these important standing rules having never been submitted to the presbyteries—and as they were totally destitute of authority, as proceeding from the General Association of Connecticut, which is invested with no power to legislate in such cases, and especially to enact laws to regulate churches not within her limits; and as much confusion and irregularity have arisen from this unnatural and unconstitutional system of union, therefore, it is resolved, that the act of assembly of 1801, entitled a ' Plan of Union,' be, and the same is hereby abrogated." See Digest, pp. 297-299.

Then follow the yeas 143, and nays 110.

They also gave in evidence the plan of union referred to in the foregoing resolution : it is in these words :

" Sect. 5.—A plan of union between Presbyterians and Congregationalists in the new settlements, adopted in 1801.

The report of the committee appointed to consider and digest a plan of government for the churches in the new settlements, was taken up and considered ; and after mature deliberation on the same, approved, as follows :

Regulations adopted by the General Assembly of the Presbyterian Church in America, and by the General Association of the State of Connecticut, (provided said Association agree to them,) with a view to prevent alienation and promote union and harmony, in those new settlements which are composed of inhabitants from these bodies.

1st. It is strictly enjoined on all their missionaries to the new settlements, to endeavour, by all proper means, to promote mutual forbearance and accommodation, between those inhabitants of the new settlements who hold the Presbyterian and those who hold the Congregational form of church government.

2nd. If in the new settlements, any church of the Congregational order shall settle a minister of the Presbyterian order, that church may, if they choose, still conduct their discipline according to Congregational principles, settling their difficulties among themselves, or by a council mutually agreed upon for that purpose : But if any difficulty shall exist between the minister and the church or any member of it, it shall be referred to the Presbytery to which the minister shall belong, provided both parties agree to it ; if not, to a council consisting of an equal number of Presbyterians and Congregationalists, agreed upon by both parties.

3d. If a Presbyterian church shall settle a minister of Congregational principles, that church may still conduct their discipline according to Presbyterian principles : excepting that if a difficulty arise between him and his church, or any member of it, the cause shall be tried by the Association, to which the said minister shall belong, provided both parties agree to it ; otherwise by a council, one-half Congregationalists, and the other half Presbyterians, mutually agreed on by the parties.

4th. If any congregation consists partly of those who hold the Congregational form of discipline, and partly of those who hold the Presbyterian form, we recommend to both parties, that this be no obstruction to their uniting in one church and settling a minister ; and that in this case, the church choose a standing committee from the communicants of said church, whose business it shall be, to call to account every member of the church, who shall conduct himself inconsistently with the laws of Christianity, and to give judgment on on such conduct ; and if the person condemned by their judgment,

be a Presbyterian, he shall have liberty to appeal to the Presbytery; if a Congregationalist, he shall have liberty to appeal to the body of the male communicants of the church; in the former case the determination of the Presbytery shall be final, unless the church consent to a further appeal to the synod, or to the General Assembly; and in the latter case, if the party condemned shall wish for a trial by a mutual council, the cause shall be referred to such council. And provided the said standing committee of any church, shall depute one of themselves to attend the Presbytery, he may have the same right to sit and act in the Presbytery, as a ruling elder of the Presbyterian church."

They also gave in evidence certain other resolutions of the General Assembly of the Presbyterian church, for the year 1837. They are in these words, viz.

" *Resolved*, That by the operation of the abrogation of the plan of Union of 1801, the Synod of the Western Reserve is, and is hereby declared to be no longer a part of the Presbyterian Church in the United States of America."

" Be it resolved, by the General Assembly of the Presbyterian Church in the United States of America, .

" 1. That in consequence of the abrogation, by this Assembly of the Plan of Union of 1801, between it and the General Association of Connecticut, as utterly unconstitutional, and therefore null and void from the beginning, the synods of Utica, Geneva and Genessee, which were formed and attached to this body, under and in execution of said " Plan of Union," be, and are hereby declared to be out of the ecclesiastical connexion of the Presbyterian Church of the United States of America, and that they are not in form or in fact an integral portion of said church."

Then follows " yeas 115, nays 88. *Nonliquet*, 1."

" The second, third, and fourth resolutions were then adopted, by yeas and nays, as follows, viz.

" 2. That the solicitude of this Assembly on the whole subject, and its urgency for the immediate decision of it, are greatly increased by reason of the gross disorders which are ascertained to have prevailed in those synods, (as well as that of the Western Reserve, against which a declarative resolution, similar to the first of these, has been passed during our present session,) it being made clear to us, that even the Plan of Union itself was never consistently carried into effect by those professing to act under it.

3. That the General Assembly has no intention, by these resolutions, or by that passed in the case of the synod of the Western Reserve, to affect in any way the ministerial standing of any members of either of said synods; nor to disturb the pastoral relation in

(The Commonwealth v. Green.)

any church; nor to interfere with the duties or relations of private Christians in their respective congregations; but only to declare and determine according to the truth and necessity of the case, and by virtue of the full authority existing in it for that purpose, the relation of all said synods, and all their constituent parts to this body, and to the Presbyterian church in the United States.

4. That inasmuch as there are reported to be several churches and ministers, if not one or two presbyteries, now in connexion with one or more of said synods, which are strictly Presbyterian in doctrine and order, be it, therefore, further resolved, that all such churches and ministers as wish to unite with us, are hereby directed to apply for admission into those presbyteries belonging to our connexion, which are most convenient to their respective locations; and that any such presbytery as aforesaid, being strictly Presbyterian in doctrine and order, and now in connexion with either of said synods, as may desire to unite with us, are hereby directed to make application, with a full statement of their cases, to the next General Assembly, which will take proper order thereon."

Then follows " yeas 113, nays 60."

They also gave in evidence the various acts of the General Assembly of the Presbyterian Church, by which the four synods mentioned in these resolutions were constituted; and also various acts by which, as the relators contended, they were from time to time recognised as portions of the church. None of these are material to the understanding of the opinion of the Court, except the following act of the General Assembly on the report of the synod of the Western Reserve, in the year 1833, which is alluded to in that opinion.

Id. p. 489, 90.—" The committee to whom was referred the report of the synod of the Western Reserve, made a report, which being read and amended, was adopted, and is as follows, viz. After having maturely considered the subject referred to them, they recommend to the assembly, without approving the views of the synod in relation to order and discipline, as stated in their report, that the report be accepted and printed in the minutes of the assembly."

The report of the synod is as follows:

" Report of the synod of the Western Reserve to the General Assembly of the Presbyterian Church in the United States of America, in relation to the direction of this synod by the last assembly, recorded in their printed minutes, p. 327.

" At the stated meeting of the synod of the Western Reserve, held at Detroit, October 8th, 1832, the following resolution was adopted, viz.

(The Commonwealth *v.* Green.)

" Resolved, That in reference to the point named by the assembly, as having been charged by common rumour against this synod; the synod having, as their custom is, and agreeably to the direction of the assembly, devoted a part of their sessions to review and examine the state of the presbyteries and churches under their care, do report to the next General Assembly:

1. That the synod see no ground for the charge of delinquency in relation to the permission alleged in the first specification. The synod would remark, that previously to the resolution of the assembly on this subject in 1838, it is believed that a difference of practice prevailed in our presbyteries, in the reception of members from corresponding churches, (as has been common in other presbyteries in different parts of the country,) without any formal profession of adopting the confession of faith of the Presbyterian church. But since the passage of that resolution by the assembly, the synod believe that no such practice has obtained in any of our presbyteries. In regard to the allegation respecting persons licensed and ordained by our presbyteries, without receiving and adopting the confession of faith, the synod have no knowledge or belief of the prevalence of any such practice in any of our presbyteries.

2. That in relation to the remaining allegation, viz. on the subject of ruling elders, the synod do not discover any reason for the charge of having violated the constitution of the church, inasmuch as that constitution does not make the eldership essential to the existence of a church, and as the number of persons in many churches is too small to admit the election of suitable persons to fill that office; and where this is not the case, the fact of there being Congregationalists mingled with Presbyterians in many churches, is a sufficient reason for the non-existence of the eldership, according to the plan of agreement between the General Assembly, and the General Association of Connecticut; from the spirit of which, the synod believe, that none of our presbyteries have departed.

However, with regard to the charge of the presbyteries allowing the office of ruling elder to go into disuse, the synod would say, that during the last year, there have been more ruling elders elected and ordained, in the churches connected with our presbyteries, than during any three or four years previously.

By order of the synod of the Western Reserve.

Attest, WM. HANFORD, Stated Clerk."

" The report of the committee to examine the stated records of the synod of the Western Reserve, which was laid on the table, was taken up, and adopted, and is as follows, viz. That the records be approved, with the exception of the sentiment on p. 154, viz. that the eldership is not essential to the existence of the Presbyterian Church. In the opinion of the committee the synod advanced a sentiment, that contravenes the principles recognized in our Form of

Government, chap. II. sec. 4. Chap. III. sect. 5. Chap. V. Chap. IX. Sects 1, 2."

They also gave in evidence a series of reports from the presbyteries within the four synods which are the subject of the resolutions of 1837, to show that they had contributed moneys to the various institutions of the church.

Various witnesses were adduced on both sides, who proved substantially, though with some conflict of evidence, the following facts, viz.

That the commissioners to the General Assembly from the four synods in question presented themselves to the clerks of the General Assembly of 1838, to have their names enrolled, and that the clerks rejected these commissioners, and refused to enrol them.

That the General Assembly of the Presbyterian Church, in the United States of America, met agreeably to appointment, in the Seventh Presbyterian church, in the city of Philadelphia, on Thursday, the 17th day of May, A. D. 1838, at 11 o'clock A. M.; and was opened with a sermon by the Rev. David Elliott, D. D., the moderator of the last assembly.

After the sermon, the moderator gave notice that as soon as the benediction was pronounced, he would take the chair, and proceed to the organization of the assembly. The benediction being pronounced, the moderator took the chair, and having opened the meeting with prayer, called upon the permanent clerk to report the roll.

The Rev. William Patton, a member of the third presbytery of New York, then rose, and asked leave to offer certain resolutions which he held in his hand.

The moderator declared the request at that time to be out of order, as the first business was the report of the clerks.

Dr. Patton appealed from the decision. The moderator declared the appeal, for the reason already stated, to be at that time out of order. Dr. Patton stated that the resolutions related to the formation of the roll, and began to read the same; but being called to order took his seat.

Thereupon the clerks reported the roll of such commissioners whose commissions were regular and constitutional, and who were entitled to seats in the General Assembly, omitting the commissions from the synods in question; they also reported a list of commissions which were irregular and informal, for the action of the committee of elections, from which likewise they omitted the names of the commissioners from the synods in question.

(The Commonwealth *v.* Green.)

After the report of the committee of commissions, composed of the stated and permanent clerks had been read, the moderator stated that the commissioners whose commissions had been examined, and whose names had been enrolled, were to be considered as members of this Assembly; and added, that if there were any commissioners present from the presbyteries belonging to the Presbyterian church in the United States of America, whose names had not been presented to the clerks, then was the time for presenting their commissions.

Dr. Mason rose, as he said, to offer a resolution to " complete the roll," by adding the names of certain commissioners who, he said, had offered their commissions to the clerks, and had been by them refused. The moderator inquired if they were from presbyteries belonging to the assembly; at the close of the sessions of last year. Dr. Mason replied that they were from presbyteries belonging to the synods of Utica, Geneva, Genessee and the Western Reserve. The moderator then stated that the motion was out of order at that time. Dr. Mason appealed from the decision of the moderator; which appeal, also, the moderator declared to be out of order, and repeated the call for commissions from presbyteries in connexion with the assembly.

The Rev. Miles P. Squier, a member of the presbytery of Geneva, then rose and stated that he had a commission from the presbytery of Geneva, which he had presented to the clerks, who refused to receive it, and that he now offered it to the assembly, and claimed his right to his seat. The moderator inquired if the presbytery of Geneva was within the bounds of the synod of Geneva. Mr. Squier replied that it was. The moderator said, " then we do not know you, sir;" and declared the application out of order. Mr. Cleaveland then rose and began to read a paper, which was as follows:

" That as the commissioners to the General Assembly for 1838, from a large number of presbyteries, had been refused their seats; and as we had been advised by counsel learned in the law, that a constitutional organization of the assembly must be secured at this time and in this place, he trusted it would not be considered as an act of discourtesy, but merely as a matter of necessity, if we now proceed to organize the General Assembly for 1838, in the fewest words, the shortest time, and with the least interruption practicable."

He thereupon moved that Dr. Beman, from the presbytery of Troy, be moderator, to preside till a new moderator be chosen. The motion was seconded by the Rev. Baxter Dickinson, from the presbytery of Cincinnati; and no other person being nominated, Mr. Cleaveland put the motion himself, and there being a loud cry of aye, and few noes, (the defendants' witnesses said none,

and that the noes were not called for,) he declared Dr. Beman to have been duly elected.

It was then moved and seconded, the motion being addressed to Dr. Beman, that the Rev. Erskine Mason, D. D., from the third presbytery of New York, and the Rev. E. W. Gilbert, from the presbytery of Wilmington, be clerks pro tempore; and no other person being put in nomination, they were declared elected by a like process.

The Rev. Samuel Fisher, D. D., was nominated as moderator; and no other person being nominated, the question of his election was put by Dr. Beman, and was declared by him to be carried in the affirmative. The Rev. Erskine Mason, and the Rev. E. W. Gilbert were chosen, the one stated, and the other permanent clerk, by a like process.

The following notice had been previously delivered to the Rev. Dr. Beman :

" Resolution of the trustees of the Seventh Presbyterian church, adopted May 7th, 1838.

"Resolved, That the General Assembly of the Presbyterian church, which is to convene in Philadelphia on the 17th inst., and which shall be organized under the direction of the moderator, and clerks officiating during the meeting of the last assembly, shall have the use of the Seventh Presbyterian church during their sessions, to the exclusion of every other assembly or convention which may be organized during the same period of time.

(Signed)          JAMES SCHOTT,
President of the Board of Trustees."

It was moved and seconded that the body so organized under Dr. Fisher, should adjourn to meet forthwith in the lecture room of the first Presbyterian church in this city. This motion was put and carried as the others had been.

Dr. Fisher then announced that the General Assembly was so adjourned, and gave notice that any commissioners who had not presented their commissions, should do so at the First Presbyterian church.

Mr. Cleaveland's motion, and all those subsequent to it, above stated, were not addressed to Dr. Elliott, who continued sitting in the moderator's chair, and calling Mr. Cleaveland, and the other parties to these proceedings, to order. Drs. Beman, Fisher, Mason and Gilbert, stood in the aisle, while exercising their offices, so claimed by them, surrounded by that portion of the commissioners

who favoured their proceedings. The other portion of the commissioners sat with their backs towards them. Upon the retirement of the body thus constituted under Dr. Fisher, (called by way of distinction the new school assembly,) a majority by twenty or thirty of the whole number of commissioners remained in the church in Ranstead Court, and acknowledged Dr. Elliott as their moderator, and disavowed the organization which commenced with Mr. Cleaveland's motion. It was not proved or asserted that a majority of the commissioners (even counting the commissioners from the four synods as voting,) voted either on Mr. Cleaveland's, or the subsequent motions; but the new school party relied upon the following by-law of the General Assembly.

"3. Members ought not without weighty reasons, to decline voting, as this practice might leave the decision of very interesting questions to a small proportion of the judicatory. Silent members, unless excused from voting, must be considered as acquiescing with the majority."

Upon the arrival of this body at the First Presbyterian church, they proceeded to transact business as the General Assembly, and among other things, elected the relators, as trustees under the act of incorporation. This is the title upon which the relators relied. There was much conflicting evidence as to the degree of tumult which existed during the process of the new school organization; the ability of all parties to hear Mr. Cleaveland's motion; and as to the persons by whom the tumult was caused.

The defendants in addition gave in evidence the following standing rules of the General Assembly:

"I. Immediately after each assembly is constituted with prayer, the moderator shall appoint a committee of commissions.

II. The commissions shall then be called for, and delivered to the committee of commissions; and the person delivering each commission shall state whether the principal or the alternate is present.

III. After the delivery of the commissions the assembly shall have a recess, until such an hour in the afternoon as will afford sufficient time to the committee to examine the commissions.

IV. The committee of commissions shall, in the afternoon, report the names of all whose commissions shall appear to be regular and constitutional; and the persons whose names shall be thus reported, shall immediately take their seats and proceed to business.

V. The first act of the assembly, when thus ready for business, shall be the appointment of a committee of elections, whose duty it shall be to examine all informal and unconstitutional commissions, and report on the same as soon as practicable."

(The Commonwealth *v.* Green.)

Min. 1837, p. 132.

" In relation to No. 7, of the proposed amendments to the Form of Government, it appears that fifty-three Presbyteries have voted in favour of the alteration, and thirteen against it. Wherefore, resolved, that the proposed amendment, viz. That in the Form of Government, Chap. XII. Sect. 7, the words 'publicly read' should be exchanged for the word 'examined,' be, and the same is hereby adopted as a part of the constitution of this Church."

Min. 1829, p. 384.

" Resolved, That the Permanent and Stated Clerks be, and they hereby are appointed a standing committee of commissions; and that the commissioners to future assemblies hand their commissions to said committee, in the room in which the assembly shall hold its sessions, on the morning of the day on which the assembly opens, previous to eleven o'clock; and further, that all commissions which may be presented during the sessions of the assembly, instead of being read in the house, shall be examined by said committee, and reported to the assembly."

They also read the following portions of the constitution of this church and of the by-laws.

" I. It is equally necessary in the judicatories of the church, as in other assemblies, that there should be a moderator or president; that the business may be conducted with order and despatch.

II. The moderator is to be considered as possessing by delegation from the whole body, all authority necessary for the preservation of order, for convening and adjourning the judicatory, and directing its operations according to the rules of the church. He is to propose to the judicatory every subject of deliberation that comes before them. He may propose what appears to him the most regular and speedy way of bringing any business to issue. He shall prevent the members from interrupting each other; and require them, in speaking, always to address the chair. He shall prevent a speaker from deviating from the subject; and from using personal reflections. He shall silence those who refuse to obey order. He shall prevent members who shall attempt to leave the judicatory without leave obtained from him. He shall, at a proper season, when the deliberations are ended, put the question and call the votes. If the judicatory be equally divided he shall possess the casting vote. If he be not willing to decide, he shall put the question a second time; and if the judicatory be again equally divided and he decline to give his vote, the question shall be lost. In all questions he shall give a concise and clear state of the object of the vote; and the vote being taken, shall then declare how the question is decided. And he shall likewise be empowered on any extraordinary emergency, to convene the judicatory by his circular letter, before the ordinary time of meeting.

(The Commonwealth *v.* Green.)

III. The moderator of the presbytery shall be chosen from year to year, or at every meeting of the presbytery, as the presbytery may think best. The moderator of the synod, and of the General Assembly, shall be chosen at each meeting of those judicatories: and the moderator, or in case of his absence, another member appointed for the purpose, shall open the next meeting with a sermon, and shall hold the chair till a new moderator be chosen."

And from the rules of order or by-laws :—

"If a quorum be assembled at the hour appointed, and the moderator be absent, the last moderator present shall be requested to take his place without delay."

They also read various passages from the constitution, Confession of Faith, &c. to prove that the government by ruling elders, was deemed by this church of divine or apostolical ordination.

They also offered to give evidence that the presbyteries within the four synods were composed in a great measure of Congregational churches, not governed by ruling elders, and yet sending unordained lay delegates to the presbyteries. This testimony was, however, excluded by his honour the judge.

Judge ROGERS.—I admitted the proceedings of the assembly of 1837, in explanation of those of 1838. I then did not, and still do not understand, how we could do without them. I then thought that the proceedings of 1837 were necessary, to the defendant's case, and I still think so. But with the reasons of these proceeding we have nothing to do. We are to determine only what was done ; the reasons of those who did it are immaterial. If the acts complained of were within the jurisdiction of the assembly, their decision must be final, even though they decided wrongfully. I do not think any church ought to wish the civil power to interfere in such matters.

They also offered to give evidence showing that the reports of the presbyteries in regard to their contributions were illusory.

Judge ROGERS.—What has this to do with the cause ?

Answer.—Mr. Randall the other day, read from the reports of the presbyteries, to the General Assembly, statements of their contributions to certain charities. We desire to show, that those reports were made, in obedience to a resolution of the assembly, requiring the presbyteries to report their contributions, not only to the boards of the church, but to all charitable societies; and that in these reports, the sums appropriated to the different objects, are not distinguished ; and we are prepared to show, that in those years, when from the extracts read, the presbyteries referred to would appear to have contributed largely, but a few hundred

dollars of those contributions were appropriated to the church funds.

Judge ROGERS.—The extracts read by Mr. Randall, were offered to prove, merely the recognition of those presbyteries by the General Assembly. In this view of the case, it is entirely immaterial, whether only one dollar, or ten thousand dollars were contributed.

The defendants also gave in evidence, from the new school pastoral charge the following resolution adopted at a caucus or convention held by the new school party, prior to the meeting of the General Assembly of 1838.

" That should a portion of the commissioners to the next General Assembly attempt to organize the assembly, without admitting to their seats commissioners from all the presbyteries recognized in the organization of the General Assembly of 1837, it will then be the duty of the commissioners present to organize the General Assembly of 1838, in all respects according to the constitution, and to transact all other necessary business consequent upon such organization."

The defendants also read in evidence the following provision of the constitution.

" VI. Before any overtures or regulations proposed by the assembly to be established as constitutional rules, shall be obligatory on the churches, it shall be necessary to transmit them to all the presbyteries, and receive the returns of at least a majority of them, in writing, approving thereof."

Also the following :—

" The General Assembly shall meet at least once in every year. On the day appointed for that purpose, the moderator of the last assembly, if present, or in case of his absence, some other minister, shall open the meeting with a sermon, and preside until a new moderator be chosen. No commissioner shall have a right to deliberate or vote in the assembly, until his name shall have been enrolled by the clerk, and his commission examined, and filed among the papers of the assembly."

The defendants also proved, that at the time Dr. Beman was called to the chair, by Mr. Cleaveland's proceeding, there were three moderators present, who had held the office more recently than he.

Each party gave in evidence various other matters, but as they are not necessary to the understanding of the opinion of the Court, they are omitted.

The defendants' counsel requested the judge, to charge the jury on the following points :—

" That the act of the General Assembly of the Presbyterian church for the year 1837, abrogating the plan of union of 1801, was constitutional and valid.

That the act of that assembly declaring the synod of the Western Reserve not to be a portion of the Presbyterian church, was within the constitutional powers of the General Assembly, and, therefore, conclusive; and not capable of being impeached in this collateral inquiry.

That the act of that assembly declaring the synods of Utica, Genessee and Geneva, and their constituent parts, to be out of the ecclesiastical connexion of the Presbyterian church of the United States of America; and that they are not in form or fact, an integral portion of the said church, was within the constitutional powers of the General Assembly, and therefore conclusive; and not capable of being impeached in this collateral proceeding.

That the General Assembly of the Presbyterian church is entitled to decide upon the right claimed by any one to a seat in that body, or in other words, on any claim of membership.

That the General Assembly of 1801, being a representative or delegated body, and a party to the arrangement called " the Plan of Union" of 1801, any of the succeeding General Assemblies who are affected in the exercise of their power by that arrangement, are entitled to declare that arrangement void, and so treat it, whenever it bears upon any of the acts or doings of these General Assemblies; provided the General Assembly of 1801 exceeded the authority delegated to it, by entering into that arrangement. And this, independently of the question, whether the General Assembly's powers be judicial or legislative.

That the General Assembly having the power to determine on the right or claim of membership, whenever the right of membership is claimed under the " Plan of Union," the General Assembly has a right to treat that " Plan of Union" as void, and to refuse seats to, or to deprive all such persons of their seats who claim under that " Plan of Union."

When the constituent, viz. a presbytery, is composed in part of materials furnished by the " Plan of Union," or of other unconstitutional materials, or in other words, when it is composed partly of unordained lay delegates from Congregational churches, then the General Assembly, as incidental to the power of judging of the qualifications of those claiming membership, is entitled to require such presbyteries to expurge these unconstitutional materials.

That the introduction of unordained lay delegates from Congregational establishments into the judicatories of this Presbyterian church, was a violation of the fundamental principles of Presbyte-

rianism; and in contravention of the act of the legislature of Pennsylvania, incorporating the trustees of this church: that any act permitting such introduction, would therefore have been void, although submitted to the presbyteries.

. That the "Plan of Union" contemplated but a temporary aid to the churches formed under it, and guarantied to them no continued connexion with the Presbyterian church, unless they adopt its discipline and form of government. There is, therefore, no breach of faith, in refusing to such churches a further continuance of connexion.

That the body which held its session in the First Presbyterian church, in the spring of 1838, have by their own acts acknowledged the continued existence of the General Assembly of 1837, up to its formal dissolution.

. These acts of acknowledgment are,

1st. By organizing at the time and place fixed by the decree of that body, on the last day of its session.

2dly. By recognising the validity of an election of trustees by that body, after the synod of the Western Reserve had been disowned.

That the acts of the General Assembly of 1837, being powerless to render void the organization of 1838, are foreign to the issue now trying; except so far as the defendants might have invoked their aid, to explain or justify the acts of the committee of commissioners in forming the roll of 1838.

The General Assembly of 1838, did not reject the delegates or commissioners from the four disowned synods; and did not, in any wise, recognise or adopt these disowning acts of the General Assembly of 1837.

The committee of commissioners for the year 1838, possessed the power, under the standing rules of 1826, to determine on the constitutionality of the commissions presented to them; and to refuse to put them on the roll for that reason. That in the exercise of this power, they are only amenable to the General Assembly; and the propriety of their decisions can only be reviewed by that body.

. That by the standing rules of the General Assembly, (vide Rules of 1826,) the commissions which were rejected by the committee of commissions, must be referred to a committee of elections.

That, by the same standing rules, the first business of the General Assembly, after the assembly is constituted with prayer, is, to hear the report of the committee of commissions on the roll.

That no commissioner has a right to vote, or otherwise participate in the business of the house, until his name is so reported.

That until such report is made, there is no house to transact any business, or to entertain any motions or appeals.

That the motion of Mr. Patton being made before the committee

of commissions had reported, was out of order, irregular, and nugatory; as was likewise his appeal, there being no house to entertain the motion or the appeal.

That the proclamation or call of the moderator, for any other commissions which had not been presented to the committee of commissions, was part of the process of forming the roll; and the report of that committee cannot be considered as made, until all commissioners had the opportunity afforded by that proclamation of presenting their commissions to this committee.

That Dr. Erskine Mason's motion was out of order.

1st. Because an interruption of this proclamation: not being responsive to it, as the commissions, which he offered, had been presented to the committee of commissions.

2dly. Because the report on the roll was not complete, until those called by the proclamation of the moderator, had the opportunity of being enrolled.

3dly. Because the first business of the house, after the report of the committee of commissions, is, by the standing rules of 1826, to appoint a committee of elections.

His, Dr. Mason's appeal, was nugatory, until the moderator's proclamation had been answered to, and time had been given for that purpose: for until then, the roll was not completed. Had the appeal been put to the house, Joshua Moore, and it might have been, others who had undisputed commissions, and which they were in the act of presenting, would have been excluded from voting on that appeal.

If the refusal to put Dr. Mason's appeal was wrong, it was a breach of that member's privilege; and the remedy was by a proceeding against the moderator, on a charge of breach of privilege. That the motion of Mr. Cleaveland can, in no sense, be considered such proceeding; for in addition to its want of form, the charge made was the refusal to admit the commissioners from the disowned synods; and not the refusing to put the appeal. If the moderator erred in declining to put the question submitted to him by Dr. Mason; it was a breach of privilege on the part of the moderator, and authorized proceedings against him as in other cases of breach of privilege; but did not authorize Dr. Mason, or any other member, to assume or exercise the functions of the moderator, in doing that which he had declined to do; and that Mr. Cleaveland's conduct was a usurpation of those functions, it belonging to the moderator alone to put motions. Mr. Squier's motion, or application, was properly treated by the moderator, as his name not having been enrolled, he had no status, or right upon the floor of the house; he should have procured an enrolled member to make the motion for him.

Mr. Cleaveland's motion was nugatory, void and a mere disorder, which neither the assembly, nor any member thereof, was bound to notice; and being a mere disorder, it could be the foundation of no subsequent regular action, and that for many reasons, viz.

(The Commonwealth v. Green.)

1st. Because there was no error, crime, or misconduct in the assembly, or its officers to justify it.

2d. It professed to proceed on the false position, that certain members had been *refused* their seats.

3d. It was not put by the proper officers, i. e., if not by the moderator, by the clerk.

4th. It was made and persisted in under or after a call to order.

5th. It was designed and intended, and professed to be a revolutionary motion, organizing a secession.

6th. It was unintelligible, from its indirection. The purpose is now said to have been, to remove Dr. Elliott, for a misdemeanor in office ; but the motion made, was to put Dr. Beman in the chair, which did not express the true purport of the proceeding; and was, therefore, deceptious and misleading.

7th. It was sudden, unexpected and unusual, and gave the members no opportunity of understanding its meaning, purpose or effect.

8th. It having been put from an unusual place, and not by an officer of the house, it is incumbent upon those who rely upon the rule, that silence is an affirmative vote, to show that every member present had a full opportunity of hearing.

9th. It was put and persisted in, after and during a motion to appoint a committee of elections, which by a standing order or rule of the assembly, was to be the *first* business of the house after the report of the committee of commissions on the roll.

10th. The preface by which it was introduced, professed to address it to a portion of the commissioners of the General Assembly, and professed to be an interruption of proceedings, then regularly progressing. If it were really intended to be addressed to the whole house, then its terms were deceptive and fraudulent, and cannot affect those who did not vote upon the same.

11th. The question not being reversed, or if reversed, done so suddenly and precipitately, and so immediately followed by another motion, as to give the dissentients no opportunity to vote, the vote upon it can in nowise be considered the act of the General Assembly.

12th. It being proved that the dissentients had a large majority, it is incumbent on the party seeking to bind them by the vote upon the question, to show that it was put by the proper person, at a proper time, in a proper form, and in distinct, plain, undeceptive and intelligible shape.

13th. The rules of order, prescribe that the question made by a member, be repeated by the moderator before it is put, in order to give the members an opportunity of understanding it. In this case, the moderator did not repeat the question, nor was there anything equivalent to it, as the motion was stated but once, and the question immediately put upon the motion.

The organization under Drs. Beman and Fisher, was subject to

the same infirmity, as that from which they dissented, for the resolution re-admitting the disowned synods, was not passed until they had elected their permanent moderator and clerks.

If the refusal of Dr. Elliott, to put a motion or an appeal, authorize the member aggrieved to put a motion to the house, such irregularity must be proportionate to the exigency, i. e. the member aggrieved, could himself put that motion (and no other,) to the house, which had been so refused.

The moderator of the assembly of 1837, was constitutionally the moderator of 1838, until the moderator for that year was elected; and was incapable of being removed, until the moderator of the year 1838, was elected.

In case the moderator of 1837 was incapable for any reason of presiding at the organization of 1838, then, by the standing rules of the assembly, the last preceding moderator present is to preside; and as at the time Dr. Beman was put in the chair, there were two more recent moderators present, they, by said standing rules, were entitled to the chair, in preference to Dr. Beman.

That the "Plan of Union" was always subject to be revoked at the will of the General Assembly; either from the nature and character of the agreement, or from the fact, that there was no reciprocity; the General Association of Connecticut being invested with no power to legislate in such cases, and especially, to enact laws to regulate churches not within her limits, (vide minutes of 1837, page 421.)

That said "Plan of Union," by introducing unordained lay delegates from Congregational churches, into the Presbyteries, which are the constituent bodies, violated fundamental provisions of the constitution of the Presbyterian Church in those articles of the constitution which provide, that the churches shall be governed by ruling elders, and shall be represented in the presbyteries by ruling elders.

That this alteration of fundamental articles of the constitution transcended the powers of the General Assembly, and could only be rendered valid, if at all, by the approval of a majority of the Presbyteries.

That as no direct approval of this measure, viz. "Plan of Union," was ever given by the presbyteries, the same never having been transmitted to them for their approbation, in order to supply this defect by long acquiescence, it must be proved, that the acquiescing presbyteries had full and entire knowledge of the exercise of rights under this "Plan of Union."

That if the jury believe that a majority of the presbyteries were in regions of country where churches were not formed on the "Plan of Union," and the statistical reports from the presbyteries of those regions, where churches were formed on that plan, disguised

these churches under the denomination of Presbyterian churches, then their continuance for any number of years, is no proof of the acquiescence of a majority of the presbyteries.

In the inquiry touching the constitutionality of these acts of assembly of 1837, disowning the four synods, it is to be taken as proved, that the churches composing those synods were Congregational, the defendants having offered to prove that fact, and the Court having rejected that testimony."

Mr. Justice Rogers, charged the jury as follows:

"Gentlemen of the jury. Before the year 1758, the Presbyterian churches in this country were under the care of two separate synods and their respective presbyteries, the synod of New York and the synod of Philadelphia.

In the year 1758, these synods were united, and were called "the synod of New York and Philadelphia." This continued until the year 1788, when the General Assembly was formed. The synod was then divided into four synods; the synod of New York and New Jersey, Philadelphia, Virginia, and the Carolinas; of these four synods the General Assembly was constituted.

In 1803, the synod of Albany was erected. This synod has been from time to time sub-divided, and the synods of Genessee, Geneva and Utica have been formed.

The synod of Pittsburgh has been also erected, out of which the synod of the Western Reserve has been formed.

These constitute the four exscinded synods, viz: the synods of Genessee, Geneva, Utica and the Western Reserve.

The General Assembly was constituted by every presbytery at their last stated meeting, preceding the meeting of the General Assembly, deputing to the General Assembly commissioners in certain specific proportions.

The Westminster confession of faith is part of the constitution of the church. The constitution could not be altered, unless two-thirds of the presbyteries, under the care of the General Assembly, prepare alterations or amendments, and such alterations or amendments were agreed to by the General Assembly.

The form of government was amended in 1821. The General Assembly now consists of an "equal delegation of bishops and elders from each presbytery in certain proportions."

The judicatories of the church consist of the session, of the presbyteries, of synods and the General Assembly.

The church-session consists of the pastor or pastors, and ruling elders of a particular congregation. A presbytery, of all the ministers and one ruling elder from each congregation within a certain district. A synod is a convention of "bishops and elders," including, at least, three presbyteries. And the General Assembly of an "equal

(The Commonwealth *v.* Green.)

delegation of bishops and elders, from each presbytery, in the following proportions, viz. each presbytery consisting of not more than twenty-four ministers, sends one minister and one elder; and each presbytery consisting of more than twenty-four ministers, sends two ministers and two elders; and in the like proportion for every twenty-four ministers in any presbytery." The delegates so appointed, are styled Commissioners to the General Assembly.

The General Assembly is the highest judicatory of the Presbyterian church. It represents, in one body, all the particular churches of this denomination of Christians.

In relation to this body, the most important undoubtedly are the various presbyteries; for, as was before said, " the General Assembly consist of an equal delegation of bishops and elders from each of the presbyteries." If the presbyteries are destroyed, the General Assembly falls, as a matter of course, as there would no longer be any constituent bodies in existence from which delegates could be sent to the General Assembly.

The presbyteries are essential features in the form of government in another particular, for before any overtures or regulations proposed by the General Assembly to be established as constitutional rules, can be obligatory on the churches, it is necessary to transmit them to all the presbyteries, and to receive the returns of at least a majority of them in writing, approving thereof.

A synod, as has been before observed, is a convention of " bishops and elders" within a district, including at least three presbyteries. The synods have a supervisory power over presbyteries, but unlike presbyteries, as such they are not essential to the existence of the General Assembly. If every synod in the United States were exscinded and destroyed, still the General Assembly would remain as the highest tribunal in the church. In this particular there is a vital difference between presbyteries and synods. The only connexion between the General Assembly and the synods is, that the former has a supervisory power over the latter.

Having thus given you an account of such parts of the form of church government as may, in some aspects of the cause, be material, I shall now call your attention to the matter in issue.

This proceeding is what is called a " *Quo warranto.*" It is issued by the Commonwealth, at the suggestion of James Tod and others, against Ashbel Green and others, to show by what authority they claim to exercise the office of trustees of the General Assembly of the Presbyterian church in the United States of America. I must here remark, that it is not only an appropriate, but the best method of trying the issue in this cause.

It is admitted, that until the 24th of May, 1838, the respondents were the rightful trustees; but it is contended by the relators, that on that day, the 24th of May, 1838, in pursuance of the act of incorporation, the General Assembly of the Presbyterian church

changed one-third of the trustees, by the election of the relators in the place and stead of the respondents.

On the 28th March, 1799, the legislature of Pennsylvania declared Ashbel Green and seventeen others, (naming them,) a body politic and corporate, by the name and style of Trustees of the General Assembly of the Presbyterian church in the United States of America.

The sixth section provides that the corporation shall not, at any time, consist of more than eighteen persons; whereof, the General Assembly may at their discretion, as often as they shall hold their sessions in the state of Pennsylvania, change one-third in such a manner as to the General Assembly may seem proper.

It was the intention of the legislature, by the act of incorporation, to provide for the election of competent persons, who, as an incorporated body, might with more ease and in a better manner, manage the temporal affairs of the church. It is only in this aspect that we have cognizance of the case.

In this country, for the mutual advantage of church and state, we have wisely separated the ecclesiastical from the civil power. The Court has as little inclination as authority to interfere with the church and its government, farther than may be necessary for its protection and security. It is only as it bears upon the corporation, which is the creature of the civil power, that we have any right to determine the validity, or to construe the acts and resolutions of the General Assembly.

Although neither the members of the General Assembly, as such, nor the General Assembly itself, are individually or aggregately members of the corporation, yet the assembly has power, from time to time, as they may deem proper, to change the trustees, and to give special instructions for their government. They stand in the relation of electors, and have been properly denominated in the argument, *quasi* corporate. The trustees only are the corporation by express words of the act of the assembly.

Unhappily, differences have arisen in the church, (the nature of which it is not necessary for us to inquire into,) which have caused a division of its members into two parties, called and known as the old and new school. These appellations we may adopt for the sake of designating the respective parties, the existence of which will have an important bearing on some of the questions involved in this important cause. It gives a key to conduct, which it would be otherwise difficult to explain.

The division continued to increase in strength and virulence until the session of 1837, when certain decisive measures, which will be hereafter stated, were taken by the General Assembly, which at this time was under the control of members, who sympathise, (as the phrase is,) with the principles of the old school.

At an early period the Presbyterian church, at their own sugges-

tion, formed unions with cognate churches, that is, with churches whose faith, principles and practice, assimilated with their own, and between whom there was no essential difference in doctrine.

On this principle a plan of union and correspondence was adopted by the assembly in 1792, with the General Association of Connecticut; with Vermont, in 1803; with that of New Hampshire, in 1810; with Massachusetts in 1811; with the Northern Associate Presbytery of Albany, in 1802; and with the Reformed Dutch Church, and the Associate Reformed Church in 1798.

These conventions, as is stated, originated in measures adopted by the General Assembly in 1790 and 1791. The delegates from each of the associated churches not only sat and deliberated with each other, but also acted and voted by virtue of the express terms of the union.

In further pursuance of the settled policy of the church to extend its sphere of usefulness, in the year 1801, a plan of union between the Presbyterians and Congregationalists was formed.

The plan, which was devised by the fathers of the church to prevent alienation and to promote harmony, was observed by the General Assembly without question by them, until the year 1835, a period of thirty-four years.

At that time it was resolved by the General Assembly, that they deemed it no longer desirable that churches should be formed in their presbyterian connexion, agreeably to the plan adopted by the Assembly and the General Association of Connecticut, in 1801. They, therefore resolved that their brethren of the General Association of Connecticut be, and they hereby are, respectfully requested to *consent* that the said plan shall be, from and after the next meeting of that association, declared to be annulled. And also resolved, that the annulling of said plan shall not in any wise interfere with the existence and lawful association of churches which *have been already formed* on this plan.

To this resolution no reasonable objection can be made, and if the matter had been permitted to rest here, we should not have been troubled with this controversy. It had not then occurred to the assembly that the plan of union was unconstitutional. The resolutions are predicated on the belief that the agreement or compact was constitutional. They request that the association of Connecticut would *consent* to rescind it. It does not seem to have been thought that this could be done without their consent. And moreover, the resolution expressly saves the rights of existing churches which had been formed on that plan.

I must be permitted to regret, for the sake of peace and harmony, that this business was not suffered to rest on the basis of resolutions which breathe the spirit of peace and good feeling. But unfortunately the General Assembly, in 1837, which was then under another influence, took a different view of the question.

(The Commonwealth v. Green.)

" As the ' Plan of Union' adopted for the new settlements, in 1801, was originally an unconstitutional act on the part of that assembly, these important standing rules having never been submitted to the presbyteries, and as they were totally destitute of authority as proceeding from the General Association of Connecticut, which is invested with no power to legislate in such cases, and especially to enact laws to regulate churches not within her limits; and as much confusion and irregularity have arisen from this unnatural, unconstitutional system of union, therefore it is resolved, that the act of the Assembly of 1801, entitled a ' Plan of Union,' be, and the same is hereby abrogated." See Digest, p. 297-99.

The resolution declares the plan of union to be unconstitutional. 1st. Because those important standing rules, as they call them, were not submitted to the presbyteries; and secondly, because the General Association of Connecticut was invested with no power to legislate in such cases, and especially to enact laws to regulate churches not within their limits.

The Court is not satisfied with the force of these reasons, and do not think the agreement, or plan of union, comes within the words or spirit of that clause in the constitution which provides, that before any overture or regulations shall be proposed by the General Assembly to be established as constitutional rules shall be obligatory on the churches, it shall be necessary to transmit them to all the presbyteries, and to receive the returns of at least a majority of them approving thereof. Nor is it in the opinion of the Court, in conflict with the constitution before its amendment in 1821, which provides that no alteration shall be made in the constitution, unless two-thirds of the presbyteries under the care of the General Assembly propose alterations or amendments, and such alterations or amendments are agreed to by the assembly.

It was a regulation made by competent parties, and not intended by either as a constitutional rule; nor was it obligatory on any of the Presbyterian churches within their connexion. Those who were competent to make it, were competent to dissolve it, without the assent of the presbyteries, as such, which could not be done, were it a constitutional rule, within the meaning of the constitution. Whether one party may dissolve it without the consent of the other, it might be unnecessary to decide. My opinion is that they can. The plan of union is intended to prevent alienation, and to promote union and harmony in the new settlements.

It is not a union of the Presbyterian *church* with a Congregational church or churches, but it purports to be, and is a plan of union between individual members of the Presbyterian and Congregational churches, in that portion of the country which was then denominated the new settlements. It is advisory and recommendatory in its character; has nothing obligatory about it. A Congregational church, as such, is not by force of the agreement incorporated with

the Presbyterian church. It has no necessary connexion with it; for it is only when the congregation consists partly of those who hold the Congregational form of discipline, and partly of those who hold the Presbyterian form, and there is an appeal to the presbytery, (as there may be in certain cases,) that the standing committee of the Congregational church, consisting partly of Presbyterians and partly of Congregationalists, may, or shall attend the presbytery, and may have the same right to sit and act in the presbytery as a ruling elder. And whatever may have been occasionally the instances to the contrary, this I conceive to be the obvious construction of the regulation. That part of the agreement was intended as a safeguard or protection of the rights of all the parties to be affected by it, without any design to confer upon the standing committee all the rights of a ruling elder.

I view it as a matter of discipline, and not of doctrine, the effect of which is to exempt those members of the different communions, who adopted it from the censures of the church to which they belong, and particularly the clerical portion of them.

The Court is also of the opinion, that after an acquiescence of nearly forty years, and particularly after the adoption by the presbyteries of the amended constitution of 1821, the plan of union is not now open to objection. The plan has been recognised by the presbyteries at various times, and different manners, under the old and amended constitution. It has been acted on by them and the General Assembly in repeated instances, and is equally as obligatory as if it had received the express sanction of the presbyteries in all the forms known to the constitution.

That acquiescence gives right, is a principle which we must admit. The constitutionality of the purchase and admission of Louisiana as a member of the union, was doubted by some of the wisest heads and purest hearts in the country, but he would be a very bold man, indeed, who would now deny that state, and Mississippi, Arkansas and Missouri, to be members of the confederation. In the memorable struggle for the admission of Missouri into the union, this objection was never taken.

Nor am I satisfied with the second reason, that the General Association of Connecticut was invested with no power to legislate in such cases, and especially to enact laws to regulate churches not within their limits. Although the General Assembly had the right to annul the plan of union, without the assent of the General Association of Connecticut, yet I must be permitted to say, that after having acted on the plan, and reaped all the advantages of it, it is rather discourteous, to say the least of it, to attempt to abrogate it without the consent of the other party. Although the association may be an advisory body, yet it does not appear that any difficulty has been started by them, or by the churches under their control. All parties acquiesced in it for thirty-six years, and it would be too

late for either now to object to its validity. Nor is there any thing in the idea, that they have no power to regulate churches not within their limits. This is a matter of consent; and there is nothing to prevent churches in one state, from submitting themselves to the ecclesiastical government of churches located in another state. The Presbyterian church has furnished us with repeated examples of this kind.

So far from believing the plan of union to be unconstitutional, I concur fully with one of the counsel, that confined within its legitimate limits, it is an agreement or regulation, which the General Assembly not only had power to make, but that it is one which is well calculated to promote the best interests of religion.

If, as is stated, the standing committee of Congregational churches have claimed and exercised the same rights as ruling elders in presbyteries, and in the General Assembly itself, it is an abuse which may be corrected by the proper tribunals; but surely that is no argument, or one of but little weight, to show that the plan of union is unconstitutional and void.

Although, in the opinion of the Court, the assembly have the right to repeal the Plan of Union without the consent of the General Association of Connecticut, yet it was unjust to repeal it, without saving the rights of existing ministers and churches.

But whether the Plan of Union be constitutional or not, is only material so far as it is made the basis of some subsequent resolutions, to which your attention will now be directed.

At the same session, and after failure of an attempt at compromise, the character of which has been the subject of much comment, the General Assembly resolved, that by the abrogation of the Plan of Union of 1801, the synod of the Western Reserve is, and is hereby declared to be, no longer a part of the Presbyterian Church.

" Resolved, That in consequence of the abrogation by this General Assembly of the Plan of Union of 1801, between it and the General Association of Connecticut, as utterly unconstitutional, and therefore null and void from the beginning, the synods of Utica, Geneva, and Genessee, which were formed and attached to this body, under and in execution of said ' Plan of Union,' be, and are hereby declared to be, out of the connexion of the Presbyterian Church in the United States of America, and that they are not, in form or in fact, an integral portion of said church."

These resolutions refer only in name to the four synods, and if we were called on for the construction alone, it might be well doubted whether they were intended, or could be made to include, the presbyteries within their limits, the constituents or electoral bodies of the General Assembly itself. I should be inclined, for the purpose of protecting their rights from a resolution so penal in its character, to say that they were not included, neither in the spirit nor the words of the resolution. But this construction we are prevented

from giving by their declarative resolution. It is there in effect said, that it is the purpose of the General Assembly to destroy the relations of all said synods and all their constituent parts to the General Assembly and to the Presbyterian church in the United States. In the fourth resolution it is declared, that any presbytery within the four synods, being strictly Presbyterian in doctrine and order, who may desire to be united with them, are hereby directed to make application, with a full statement of their case, to the next General Assembly, which will take proper order thereon.

There is no mistaking the character of these resolutions. It is an immediate dissolution of all connexion between the four synods and all their constituent parts, and the General Assembly. They are destructive of the rights of electors of the General Assembly. The connexion might be renewed, it is true, by each of the presbyteries making application to the next General Assembly, but they are at liberty to accept or refuse them, provided they, the General Assembly, deem them strictly Presbyterian in doctrine and order. As they had the right to admit them, they had the right, also, to refuse them, unless in their opinion, they were strictly presbyterian in doctrine and order.

By these resolutions, the commissioners, who had acted with the General Assembly up to that time, were deprived of their seats. At the same time, four synods, with twenty-eight presbyteries, were cut off from all connexion with the Presbyterian church. The General Assembly resolved, that because the plan of 1801 was unconstitutional, those synods and their constituents parts are no longer integral parts of the Presbyterian church.

You will observe, that I have already said the Plan of Union is constitutional. That reason therefore fails. They have resolved that it is not only unconstitutional, but that it is null and void, from the beginning. Instead of a prospective, they have given their resolutions a retrospective effect, the injustice of which is most manifest.

But admitting that the Plan of Union is unconstitutional, null and void, from the beginning, I cannot perceive, what justification that furnishes for the exscinding resolutions. The infusion of Congregationalists with the presbyteries, or the General Assembly itself, does not invalidate the acts of the General Assembly. They had a right notwithstanding the charter which recognises elders and ministers as composing the Presbyterian church, to perform the functions committed to them by the constitution. And among them to establish and divide synods to create presbyteries, as in her judgment the exigencies of the church might demand.

Accordingly we find that the four synods, and all the presbyteries attached to them, have been formed since the year 1801. The assembly creates the synods, and the synods the presbyteries. Sometimes the assembly creates the presbyteries—a course pursued

(The Commonwealth v. Green.)

with some of the presbyteries, which have been exscinded. They have been established since, but this is no evidence that the four exscinded synods were formed and attached to the General Assembly under, and in execution of, the Plan of Union. The compact, as has been before observed, was intended for a different purpose, and imposed on the Presbyterian church no obligation to admit churches formed on the plan as members. It was a voluntary act, and not the necessary result of the agreement; nor does it appear that the presbyteries were formed and incorporated with the church on any other terms or conditions than other presbyterians, who were in regular course taken into the presbyterian connexion.

But, gentlemen, when resolutions of so unusual a character, so condemnatory, and so destructive of the rights of electors, the constituents of the assembly itself, are passed, we have a right to require that the substantial forms of justice be observed. But so far from this, the General Assembly, in the plenitude of its power, has undertaken to exclude from all their rights and privileges twenty-eight presbyteries, who are its constituents, without notice, and without even the form of trial. By the resolutions, the commissioners, who had acted as members of the General Assembly for two weeks, were at once deprived of their seats. Four synods, twenty-eight presbyteries, five hundred and nine ministers, five hundred and ninety-nine churches, and sixty-thousand communicants, were at once disfranchised and deprived of their privileges in this church.

This proceeding is not only contrary to the eternal principles of justice, the principles of the common law, but it is at variance with the constitution of the church.

This proceeding is not in the nature of a legislative, but it is a judicial proceeding to all intents and purposes. It is idle to deny that the presbyteries within the infected districts, as they are called, were treated as enemies and offenders, against the rules, regulations, and doctrines of the church. If there is any thing that a man values, it is his religious rights.

And of this opinion were the General Assembly themselves; for, only a few days before, they came to the following resolutions:

" Resolved, 1. That the proper steps be now taken to cite to the bar of the next assembly such inferior judicatories as are charged by common fame with irregularities.

" 2. That a special committee be now appointed to ascertain what inferior judicatories are thus charged by common fame, prepare charges and specifications against them, and to digest a suitable plan of procedure in the matter; and that said committee be requested to report as soon as practicable."

Nothing further appears to have been done in this matter in the General Assembly, for, after failure of the attempt at compromise, they appear to have discovered a much more expeditious, if not a more agreeable method of effecting their object.

(The Commonwealth *v.* Green.)

I have said that exscinding the presbyteries without notice, and without trial, was not only contrary to the common law, but it was contrary to the constitution of the church. And it is only necessary to open the book of discipline to see how very careful the fathers of the church have been to secure to the accused a full, fair and impartial trial.

Notice is given to the parties concerned, at least ten days before the meeting of the judicatory. The accused are informed of the names of all the witnesses to be adduced against him. When the charges are exhibited, the time, places and circumstances are stated, if by possibility they can be ascertained; citations are issued, signed by the moderator or clerk, by order and in the name of the judicatory.

Judicatories are enjoined to ascertain, before proceeding to trial, that their citations have been duly served. And, to secure a fair and impartial trial, the witnesses are to be examined in the presence of the accused, who is permitted to ask any question tending to his own exculpation. The judgment, when rendered, is regularly entered on the records of the judicatory.

If these proceedings before judgment, are requisite in the case of the meanest member of the church, (the omission of which, by any of the inferior judicatories, would call down on the offenders the severest censure of the General Assembly,) it is inconceivable that similar precautions are not necessary to protect the rights of presbyteries, which consist of many individuals, from the injustice, violence, and party spirit of the General Assembly itself. Constitutions are intended to protect the weak, the minority, from the injustice of the majority.

The majority for the most part, were able to protect themselves. It is the minority that need protection, and for this purpose it is necessary to encircle them with at least all the *forms* of justice.

This, as has been before observed, is a judicial act; and if a regular trial had been had, and judgment rendered, the sentence would have been conclusive. We should not have attempted to examine the justice of the proceeding; but inasmuch as there have been no citations, and no trial, I instruct you, that the resolution of the General Assembly exscinding the four synods of Utica, Geneva, Genessee, and the Western Reserve, are *unconstitutional, null* and *void.*

The judgments of all Courts, whether ecclesiastical or civil, whether of inferior or superior judicatories, are absolutely void, when rendered without citations, and without trial, and without the opportunity of a hearing.

But admitting this to be in the nature of a legislative proceeding, still it is void; for I deny the right of any legislature to deprive an elector of his right to vote, either with or without trial.

This is a power which can only be exercised by a judicial tribunal,

who act under the sanction of an oath, who examine witnesses on oath, and who conform to all the rules of evidence established by the sages of the law.

If the legislature of Pennsylvania should dare, by resolution or otherwise, to deprive one of you, gentlemen, of your right as an elector, it would be the duty of the Court to declare such an act null and void. I am unable to distinguish the difference between the two cases.

Whether the General Assembly are the proper tribunal, in the first instance, for the trial of offences, or whether the presbyteries are amenable to their judicatories, in this or any other mode, it is unnecessary to decide, as the Court are clearly of the opinion, that if they have the right, it must be exercised with the same rules and regulations which are applicable to the inferior judicatories.

Personal process in each case may be tedious, agitating and troublesome in the highest degree ; but it is obviously not impossible. Nor does it strike me as impossible to devise a plan under the constitution to correct heresy and schism, without resort to personal process in such case. But if it were so, this is an excuse but it is no justification of the exscinding resolutions.

Offenders, according to the rules of the church, may be brought before a judicatory by common fame. But I perceive no power given to convict on common fame.

You will remark, gentlemen, that the presbyteries, by the constitution of the church, are the electors of the General Assembly. Their right of representation has been taken away without trial, without the examination (as far as we know) of a single witness.

Whether these presbyteries have Congregational churches in their connexion, is not now material. It is possible that had a trial been had, that point, which is deemed so important, may have been disproved. At any rate, it would seem a singular reason for dissolving a whole presbytery, that one church was contaminated with false and heretical doctrines, or doctrine not strictly Presbyterian ; that a whole presbytery should be rejected, because a single church was governed without the benefit of ruling elders. It would be a reason, perhaps a good one, for cutting off that church from the Presbyterian connexion, but none for casting out the whole presbytery. And this gentlemen, would be particularly severe on the members and congregations, when the fact was known at the time the presbytery was created such connexion did exist.

If, however, after having condemned this (as it is called) unnatural connexion, the presbyteries should obstinately continue to adhere to it, then they would justly expose themselves to the severest censures of the church. But whether there is any mode known to the constitution, by which the presbytery can be deprived of the right of representation on the floor of the General Assembly, is a point

which is not necessary to the case, and which I shall not undertake to decide.

I have been requested by the respondents' counsel to instruct you, that the introduction of lay delegates from Congregational establishments into the judicatories of the Presbyterian church, was a violation of the fundamental principle of Presbyterianism, and a contradiction of the act of the legislature of Pennsylvania, incorporating the trustees of the church. But any act permitting such introduction would therefore have been void, although submitted to the presbyteries. As an abstract question on this point I give an affirmative answer, although, gentlemen, I am unable to see the bearing it has on the matter at issue in this cause.

You have already seen that the Court is of the opinion that the exscinding resolutions are unconstitutional, null and void; yet this did not of itself dissolve the General Assembly. The assembly was dissolved at the termination of its sessions. You will perceive in the course of the remarks which I shall have to make to you, that the acts of this assembly will have an important influence on the proceedings of the assembly of 1838.

The General Assembly of the Presbyterian church is entitled to decide upon the right claimed by any one to a seat in that body, but unlike legislative bodies, their decision is the subject of revision. Ecclesiastical judicatories are subject to the control of the law.

I also instruct you, that a mandamus would not reach the case, for before the remedy could be applied, the General Assembly would be dissolved, and it would be impossible to foresee whether the next assembly would persist in their illegal and unconstitutional course of conduct. You will recollect that the commissioners are elected a short time before the meeting of the General Assembly, and that that body, which sits but a few weeks for the transaction of business is dissolved, and a new General Assembly is called, at the termination of the sessions.

Having thus disposed of the proceedings of the General Assembly of 1837, we will now proceed to the acts of 1838. It will perhaps conduce to a proper understanding of the somewhat extraordinary proceedings which then took place, to advert to the practice of the General Assembly in times of less excitement and interest than existed on that occasion.

After the business of the assembly is finished, the General Assembly is dissolved, and another General Assembly is directed to be chosen in the same manner, to meet at a time and place designated by the assembly.

The moderator, or in case of his absence, another member appointed for the purpose, opens the next meeting with a sermon; he is directed to hold the chair until a new moderator be chosen. As this is for the purpose of organization, it is not necessary that he be a member, nor is it necessary that the clerks should be members, who are requested to attend for the same purpose.

(The Commonwealth *v.* Green.)

By the practice of the assembly, in pursuance of a regulation for that purpose, the stated and permanent clerks are a standing committee on commissions. To them are submitted the commissions of members; they decide on them in the first place, and if unexceptionable in form or substance, they are enrolled as members of the house; if exceptionable, they report them as such in a separate list. The moderator, after divine service, opens the session with prayer. He takes his seat as moderator, and proceeds to organize the house. The first business in order is the report of the clerks, who are the committee on commissions, who made a report, stating on the roll those who are members, and designating either in the roll, or in a separate list, those whose commissions have been examined and found defective either in form or in substance.

The next business in order is to appoint a committee on elections from the list of members who have been enrolled.

To that committee are referred the commissions of such persons as may claim seats, whose commissions have been examined and rejected.

It is usual to appoint the committee on elections on the morning of the first day of the session, and they, unless in case of difficulty, report to the house in the afternoon, and the house decides upon the propriety of the report. It would seem also to be the practice, that when a commissioner has omitted to hand in his commission to the clerks, before the meeting of the assembly, he may do so in the assembly, and the committee of commissions may add his name to the roll of members.

After the house is organized, they proceed to the choice of a moderator, and stated and permanent clerks, to preside over their deliberations, and to keep their records during their session.

You will observe that I am speaking of the rules of practice in the sessions of 1837 and 1839.

As the church increased in numbers, and I may add without giving offence, after the spirit of contention increased also in the same or a greater ratio, the simplicity of the ancient practice gradually changed. The changes have been stated with great clearness by one of our venerable fathers, but as we have to do with existing rather than ancient rules, it is not necessary for me to notice them.

The jury will recollect that the Court has decided that the exscinding resolutions of the General Assembly of 1837, were unconstitutional null and void.

It results from this opinion, that the commissioners from the presbyteries within the bounds of these synods, had the same right to seats in the General Assembly as the members from other presbyteries within the jurisdiction of the assembly, liable to be dealt with by them in the same manner as commissioners from other presbyteries.

It was under these circumstances, they presented themselves with commissions in proper form, to Mr. Krebs and Dr. M'Dowell, the clerks of the former assembly. They not only rejected their commissions, but refused to put their names on the roll at all.

I shall not now stop to inquire whether these gentlemen were or were not, pledged to the course they thought proper to pursue, nor into the question whether they were the judges of the constitutionality of an act of the former assembly, as I am clearly of the opinion, and so I instruct you, that they grossly erred in refusing to place their names on the list of rejected applicants. They were the committee on commissions to whom such questions are in the first place referred. It was their duty to decide on the propriety of the application, and to refer the decision to the further action of the house, by adding their names to the roll of members whose commissions had been examined and rejected.

They cannot consider commissions, in other respects regular, as alien and outlawed, merely because they proceeded from presbyteries that had been unconstitutionally put out of the pale of the church without citation and without trial.

It is therefore, the opinion of the Court, that in this there was a palpable violation of the rights of the proscribed commissioners. And this, gentlemen, was the second *error* committed, and which led to the scene of disorder which ensued; so little creditable to a Christian assembly.

After the moderator, Dr. Elliott, had taken the chair, Dr. Patton addressed the chair, and stated that he had certain resolutions to offer. The moderator decided that he was out of order, that the first business was the report of the clerks, who, you will recollect, were the committee on commissions.

Dr. Patton stated that his motion or resolution had reference to the formation of the roll, that it was his intention to make his motion, and have the question taken without debate. The moderator said the clerks were proceeding with their report. Dr. Patton reminded the moderator that he had the floor before the clerks. The moderator still decided that he was out of order, whereupon Dr. Patton respectfully appealed from the decision of the chair. The moderator decided that the appeal was out of order, and stated as a reason for the decision, that there was no house to which the appeal could be taken.

The Court is of the opinion that the decision of the moderator was correct, for the reason given by him. It is a rule of the assembly that no persons shall be permitted to vote unless they are enrolled, and until the report of the committee on commissions, it cannot be judicially known who are members of the house, and as such, privileged to take part in the organization. If, however, there was a majority for it, arising from the absence of the moderator, or the refusal of the clerks to report the roll, there would be no

(The Commonwealth *v.* Green.)

difficulty in organizing the assembly. The decision of the moderator was correct, if the reason assigned was the true reason.

After this disposition of Dr. Patton's motion, the clerks made a report, omitting, improperly, as has been before stated, the names of the commissioners from the exscinded presbyteries, and the moderator announced to those who had not presented their commissions, that now was the time to present them, and have themselves enrolled. Some of the witnesses say that the moderator announced that, if there were any names *omitted,* this was the time to present their commissions. The one side say that this was a distinct intimation from the moderator himself, that now was the time to present the commissions of the commissioners from the exscinded presbyteries. The other say it included those only who had *not* presented their commissions to the clerks. That the only course to be pursued as to those who had presented their commissions, and had their claim to be enrolled refused, was to have their case referred to the committee on elections, on whose report only would it come properly before the assembly.

However the fact may be, and this of course you will decide, at this time Dr. Mason, a member whose seat was uncontested, and who had been reported by the clerks to the house as a member, moved that the names of the commissioners from the exscinded synods should be added to the roll. He had the commissions in his hand, and at the time of the motion, stated that they were the commissions of commissioners, which had been rejected by the clerks. The moderator inquired from what presbyteries those commissioners came. Dr. Mason replied, they came from the synods of Utica, Geneva, Genessee, and the Western Reserve. The moderator declared Dr. Mason *out of order,* or said that he was out of order at that time. The witnesses differ as to the precise expression, but whatever may have been the reason assigned, they all concur that the moderator declared Dr. Mason out of order. Dr. Mason said, that with great respect to the chair, he must appeal from the decision. The appeal was seconded. The moderator refused to put the appeal, declaring the *appeal* to be out of order.

In this stage of the cause it is unnecessary to decide whether the original motion was or was not out of order. I shall put this part of the case on the refusal of the moderator to put the question on the appeal. The question is not whether an appeal may not be out of order, but it is whether this appeal was out of order. If the moderator had put the question on the appeal, it is possible the house would have decided that the original motion was out of order. They might have thought that the matter was properly referable to the committee of elections; that it was a privileged question; or the assembly might by possibility have taken a different view of the question. And whatever they might have thought and decided, would have been conclusive.

But by refusing to put the question, the moderator took all power to himself over this question. No reason was given by the moderator. It rested simply upon *his will.* In the opinion of the Court, it was a dereliction of duty—a usurpation of authority, which called for the censure of the house. He could not then allege, as he had done on a former occasion, that there was no house to which the appeal could be taken. At that time, you will recollect, that the clerks had made their report, and it was then ascertained what members had a right to vote.

Had the question on the appeal been allowed, it could then have been ascertained whether a motion had been made for the appointment of the committee on elections. As it is, it is doubtful whether the motion was made before or after the motion made by Dr. Mason.

And here, let me remark, that, I look upon the refusal of the clerks to put the names of the commisioners on the roll, and this refusal of the moderator to put the question on the appeal to the house as most unfortunate.

If the excitement did not *then* commence, yet it, with the uproar and confusion which ensued, from this time greatly increased. After the refusal of the moderator to allow an appeal, the Rev. Miles Squier arose and said, that *he* had presented his commission to the clerks, which they had refused to receive. The moderator asked from what presbytery *he* came. He said from the presbytery of Geneva. The moderator asked if it was within the bounds of the synod of Geneva. He said it was. The moderator then replied, *we do not know you.* The precise meaning and import of these words has been the subject of comment. It will be for you to give them such weight as you think them entitled to, in another part of this cause.

And here, let me remark, that the witness had not a right, (whatever injustice he may have suffered,) either to speak or vote on any question before the house. He had not been reported as a member by the clerks; and the rules of the General Assembly required, that before a member speak or vote, he must be enrolled.

To this time the witnesses substantially agree in their statement. There was but little noise, and but little confusion. Every person saw, and every person heard, all the transactions in the assembly.

And here gentlemen, it will be your solemn duty, respectfully, but firmly, to decide upon the conduct of the moderator.

Was he performing his duty as the presiding officer of the house in its organization? or was he carrying out the unconstitutional and void proceeding of the General Assembly of 1837, which cut off from the body of the Presbyterian Church, four synods, twenty-eight presbyteries, five hundred and nine ministers, and near sixty thousand communicants, without citation, and without trial?

I put the question to you, because it is the opinion of the Court,

that the General Assembly has a right to depose their moderator, upon sufficient cause.

This power is necessary for the protection of the house, otherwise the moderator, instead of being the *servant,* would be the *master* of the house. There is nothing in the constitution of the church that restricts or impairs the right.

It applies to all moderators, whether moderators for the session, or moderators for organization. The right is, perhaps, less questionable in the latter than in the former cause. He is a ministerial as well as a judicial officer.

Nor do I think that they are restrained in their choice to a moderator of a former year, who may be present. That rule applies only to ordinary cases, when the moderator of the last year is not in attendance, or is unable, from some physical reason, to discharge the duties of the office. It does not apply to the peculiar and extraordinary circumstance of this case.

The deposition of a moderator, and the election of another in his place, it appears, is not without precedent in the history of the church.

There is one thing certain, that the deposition of a moderator, and the election of another, if in other respects regular, will not of itself vitiate the organization.

After Mr. Squier had taken his seat, upon the emphatic declaration of the moderator, ' we do not know you,' Mr. Cleaveland arose.

Mr. Cleaveland held in his hand a paper from which he read, at the same time accompanying it with remarks not on the paper. It is not distinctly in evidence what he did say, but in substance it was perhaps this:

That as the commissioners to the General Assembly of 1838, from a large number of presbyteries, had been refused their seats, and as we have been advised by counsel, learned in the law, that a constitutional organization of the assembly must be secured at this time and in this place, he trusted it would not be considered as an act of discourtesy, but merely a matter of necessity, if we now proceed to organize the General Assembly of 1838, in the fewest words, the shortest time, and with the least interruption practicable.

Mr. Cleaveland then moved that Dr. Beman of the presbytery of Troy, be moderator, or, as some of the witnesses say, that he take the chair. The motion being seconded, the question was put by Mr. Cleaveland, and was carried, as the witnesses for the relators say, by a large majority, and by this they mean that a large majority of voices voted in the affirmative. The question was reversed, and, as the same witnesses say, there were some voices coming from the south-west corner of the church, who voted in the negative. This is denied by the respondents.

Dr. Beman, who was sitting in a pew the locality of which has been described to you, stept into the aisle, and called the house to

(The Commonwealth *v.* Green.)

order. A motion was then made that Dr. Mason and Mr. Gilbert be appointed clerks. There being no others put in nomination, the question was put by the moderator, Dr. Beman, in the affirmative and negative, and there was a majority of voices in their favour.

Dr. Beman then stated that the next business in order was the election of a moderator. A member nominated Dr. Fisher, and no other person being in nomination, the question was put affirmatively and negatively, and Dr. Fisher was elected by a large majority of voices. There was no negative votes on this nomination; several of the witnesses say he was unanimously elected.

Dr. Beman then announced the election of Dr. Fisher, as moderator, and said he should govern himself by the rules which might be hereafter adopted.

Dr. Fisher stepped into the aisle, moved towards the north end of the church, and called for business; and Dr. Mason and Mr. Gilbert were chosen clerks, no others being put in nomination.

Dr. Beman stated that some difficulties had been made by the trustees about the occupation of the church in which they were then sitting. To avoid difficulty, a motion was made to adjourn to meet forthwith at the lecture room at the First Presbyterian church. The question was taken on the motion, and was decided in the affirmative, there being no votes in the negative. The result of the vote was announced by Dr. Fisher, who then stated if there were any commissioners who had not presented their commissions, they might then and there attend for that purpose. The members of the house then repaired to the lecture-room of the First Presbyterian church, proceeded with their business, and on the 24th of May, 1838, elected the relators trustees, in the place and stead of the respondents.

This is the relators' case, and here I will direct your attention to some of the points which have been raised by the respondents' counsel.

The respondents contend that Mr. Cleaveland had no right to put the question. They object, also, to the time and manner of putting the question. Under one or other of these points, I will endeavour to include the question which has been raised, and which has been argued with such force and with such a variety of illustrations.

Had Mr. Cleaveland a right to put this question? It must be conceded, that unless he was authorized to take the sense of the house, the members were not bound to vote against it. In ordinary cases, it is usual for a member who moves a question, to put it in writing, and deliver it to the speaker, who, when it has been seconded, proposes it to the house, and the house are then said to be in possession of the question. But this, the relators say, is not an *ordinary* question, but one of a peculiar nature. They allege, that the moderator has shown gross partiality and injustice in the chair; that he was engaged in a plan or scheme to carry out the unconstitutional and void act of 1837, which deprived certain commissioners of their

seats; that this authorized the house to displace him, and to elect another to discharge the duties which he failed or was unwilling to perform. If this were so, of which you are the judges, Mr. Cleaveland had a right to take the sense of the house on the propriety of the moderator's conduct. It would be worse than useless to require him to put the question on his own deposition, for this the house were authorized to believe he would refuse to perform, as he had failed in the performance of his duty before. The law compels no person to do a vain or nugatory thing. The law maxim is, "*Lex neminem cogit ad vana, seu impossibilia.*" Nor, gentlemen, was it necessary that it should be taken by clerks, if they, as well as the moderator, were engaged in the same plan, to deprive members of seats, to which they were justly and constitutionally entitled. It is the opinion of the Court, that a member, although not an officer, is entitled to put a question to the house under such circumstances.

The motion which Mr. Cleaveland made, after explaining his object, was either that Dr. Beman be moderator, or that Dr. Beman be called to the chair. It is of no consequence in which form the motion was made. They are substantially the same. The motion amounted to this : that Dr. Elliott, who occupied the chair, should be deposed, and that Dr. Beman should be elected chairman and moderator in his stead. It was a pertinent question, easily understood, and not calculated to mislead the dullest member of the assembly. It was in proper form, and in proper time, for, gentlemen, it was not necessary to precede it by a motion that the house should now proceed to the choice of a moderator. All these requisites are substantially comprised in the motion which was made. There was nothing in the question, or in the manner of putting, which was disorderly, or which might have led to disorder. Mr. Cleaveland put the question to the house, which under certain circumstances, of which I have already said you are the judges, he had a right to do. In the course of his remarks, he turned himself partly round from the moderator, but this, so far as any point of law is involved, is of no sort of consequence. It is also contended by the respondents, that the claim of members to seats, according to the standing order of the house, was referable to the committee on elections, and further that the house cannot enter into business until the organization is complete. The latter point the Court answers in the negative. There is no doubt the house may elect a moderator, although the seats of some of the members are contested. In general, they would prefer to await the report of the committee on elections; but this would be a matter of discretion. The right to seats would be as well, if not better decided, after the house was organized by the election of a moderator, as when it was in its inchoate or incipient state. Such an objection would not vitiate the organization, whatever cause there might be on the part of those who had been deprived of seats, to complain of the precipitation of

the assembly in proceeding to business, particularly if done with a view of preventing them from partaking in the business.

In deciding on the first point, and others which have been raised by the respondents, it is necessary to advert to the nature of the questions themselves.

Dr. Mason moved that the names of certain members who had been unconstitutionally and unjustly deprived of seats in the assembly, should be added to the roll. The motion of Mr. Cleaveland, and the subsequent resolutions or motions, were the consequences of the decision of the moderator, that Dr. Mason's motion was out of order, and the refusal of the moderator to allow an appeal to the house. The right of members was unjustly invaded, and from this moment it became a question of privilege, which over-rides all other questions whatever. A question of privilege is always in order, to which privileged questions, such as the appointment of a committee of elections, must give way. The cry, therefore, of " order," from the moderator, or from any member whatever, under such circumstances, would be disorderly. Two inconsistent rights cannot exist at the same time; and it is obvious that if a member, or the moderator may put a stop to a proceeding which involves in it the conduct of the moderator himself, in the discharge of his high functions, and a question of privilege, by the cry of order, it would be an easy and effectual mode of destroying the rights of members in any deliberative assembly. It is usual, when it is intended to prevent a member from proceeding with a motion, to rise to order, and a requisition is then made by the moderator that the member take his seat. It is the opinion of the Court, that Dr. Mason had the right to make his motion before the appointment of the committee on elections. Indeed, I know of no other mode of getting this question before the committee on elections, except by bringing it before the house, who might either decide it for themselves, or, if they thought proper, refer it to that committee, in whose report it would again come before the house. On this point, I wish you distinctly to understand, that it is the opinion of the Court, and that I so instruct you, that if you believe that the conduct of the moderator and the clerks was the result of a preconcerted plan with a portion of the members, to carry out the unconstitutional and void act of 1837, which deprived the members from certain presbyteries of seats in the assembly, then, in this particular, the requisitions of the law have been substantially complied with.

That the fact that Mr. Cleaveland put the question instead of the moderator, the cries of order when this was in progress, the omission of some of the formula usually observed when there is no contest and no excitement, such as standing in the aisle, instead of taking the chair occupied by the moderator, not using the usual insignia of office, putting the question in an unusual place, and the short time consumed in the organization of the house, and three or more

(The Commonwealth v. Green.)

members standing at the same time, will not vitiate the organization, if you should be of the opinion that this became necessary from the illegal and improper conduct of the adverse party.

It is a singular point, gentlemen, that this part of the respondents' case rests upon standing rules which were not then in existence. You will recollect, that each assembly adopted its own rules; indeed, both the relators and respondents have appealed to these rules. I will remark, that the roll of members reported by Mr. Krebs and Mr. M'Dowell, was the roll of the house. As such, it was virtually in the possession of the clerks afterwards chosen, provided they were regularly and duly elected. It is the opinion of the Court, that the existence of a house competent to perform all the functions of a General Assembly, does not depend on the observance or non-observance of the standing order of the house. You, however, must take this opinion with the qualification, that you believe that the house had been substantially organized for the transaction of business; that you should believe that the deviation from the accustomed course was the necessary result of a preconcerted plan unconstitutionally to exclude the members from the exscinded presbyteries from their seats in the assembly. And here, gentlemen, let me request your particular attention to the point in issue. The relators say that they are trustees regularly appointed by the General Assembly of the Presbyterian Church. In other words, they affirm that the house which assembled in the lecture room of the First Presbyterian Church was the General Assembly of the Presbyterian Church. This is an affirmative proposition, which the relators are bound to support.

The question is not which is the General Assembly, but whether they are the General Assembly, and as such had a right to elect the relators trustees. This allegation the relators must sustain to your satisfaction, otherwise your verdict must be in favour of the respondents.

The respondents strenuously deny that the portion of brethren who assembled in the First Presbyterian church, are the General Assembly. On this point, both parties, the relators and respondents, have put themselves upon the country—and you, gentlemen, are that country.

Let me now briefly call your attention to the relators' case. The moderator, Dr. Elliott, proceeded to organize the house. The clerks, Mr. Krebs and Dr. M'Dowell, reported to the house the roll of members, omitting those who were not entitled to seats. Dr. Patton offered a resolution on the formation of the roll. This motion was declared by the moderator to be out of order, also his appeal was declared to be out of order. Dr. Mason then moved that the names of the members from the presbyteries within the exscinded synods should be added to the roll. This motion was declared by the moderator to be out of order. An appeal from that decision

was demanded, which was also declared to be out of order. On motion of Mr. Cleaveland, the former moderator was deposed for sufficient cause, and Dr. Beman was elected moderator, and Mr. Gilbert and Dr. Mason were elected clerks. After organization, Dr. Fisher was elected moderator, and Mr. Gilbert and Dr. Mason elected clerks for the assembly. The assembly being thus organized by the appointment of officers, adjourned to meet forthwith at the lecture room of the First Presbyterian church, and accordingly met in pursuance of the adjournment, and on the 24th of May, 1838, in due form, elected the relators trustees. This, gentlemen, is a summary of the plaintiffs' case; and if the facts are as stated, your verdict should be rendered in favour of the relators.

The respondents deny that the portion of brethren who assembled in the First Presbyterian church are the General Assembly.

Their objections, in addition to the points which have been already stated, is, that there was not a full and free expression of the opinion of the house.

They allege that the various motions for the appointment of moderator and clerks, and for the adjournment, were not carried by a majority of the house.

It is hardly necessary to observe that spectators had no right to vote, nor had members not enrolled by the clerks, although entitled to seats, a right to vote. But notwithstanding this, it is the opinion of the Court, that if, after deducting those who voted and were not entitled to vote, there was a clear majority in favour of the several motions, this irregularity, or, if you please, something worse, would not vitiate the organization. The presumption is, that none but qualified persons voted; but there is proof that some voted who were not enrolled, yet this of itself will not destroy the respondents' right of action. You, gentlemen, will, in the first place, inquire whether there was a majority of affirmative voices of members entitled to vote.

If there was not, there is an end of the question, and your verdict must be in favour of the respondents.

But if there was a majority, you will further inquire whether the question on the several motions was reversed.

If they were not reversed, your verdict must be in favour of the respondents; for in that case it is very clear the members had no opportunity of showing their dissent to several motions or propositions which were submitted to them.

These, gentlemen, are questions of fact for your decision. I will content myself with referring to the evidence and arguments of the counsel, and at the same time observing to you that it is your duty to reconcile the testimony of your case, and with one other observation, that affirmative testimony is more to be relied on than negative testimony.

And here, gentlemen, I wish you distinctly to understand, that it

is the majority of those who were entitled to vote, and who actually voted, that is to be counted on the various questions which were submitted to the house. I wish you also to understand that it is the majority of members that had been enrolled that must determine this question. When there is a quorum of members present, the moderator can only notice those who actually vote, and not those who do not choose to exercise their privilege of voting. "Whenever," says Lord Mansfield, "electors are present and don't vote at all, they virtually acquiesce in the decision of those who do."

And with this principle agrees one of the rules of the General Assembly itself, which must be familiar to every member:

"Members (30th rule) ought not, without weighty reasons, to decline voting, as this practice might leave the decision of very interesting questions to a small proportion of the judicatory. Silent members, unless excused from voting, must be considered as acquiescing with the majority."

This is not only the doctrine of the common law, of the written law, as you have seen, but it is the doctrine of common sense, for without the benefit of this rule, it would be almost impossible, certainly very inconvenient, to transact business in a large deliberative assembly.

Of this rule, gentlemen, we have had very lately a most memorable instance. The fundamental principles of your government have been altered; a new constitution has been established by a plurality of votes; forty thousand electors, who deposited their votes for one or the other of the candidates for governor, did not cast them at all on that most interesting and important of all questions. But notwithstanding this, the amended constitution has been proclaimed by your executive, and recognised by your legislature, and by the people, as the supreme law of the land. This, gentlemen, has been stigmatised as a technical rule of law, a fiction and intendment in law. It is sufficient for us, gentlemen, that it is a rule of law. We must not be wiser than the law; for if we attempt this, we endanger every thing we hold dear—our life, our liberty, our property.

Nor, gentlemen, can we know any thing of any fancied equity as contradistinguished from the law. The law is the equity of the case, and it must be so considered under the most awful responsibility, by this Court, and this jury. In my opinion, a Court and jury can never be better employed than when they are vindicating the safe and salutary principles of the common law.

But the respondents further object that the design of the new school brethren was not to organize a General Assembly according to the forms prescribed by the constitution, but that they intended and it was so understood by them, to effect an ex-parte organization, with a view to a peaceable separation of the church. If this was the intention, and was so understood at the time, the house which

assembled in the First Presbyterian church, cannot be recognized as the General Assembly, competent to appoint trustees under the charter. Having chosen voluntarily to leave the church, they can no longer be permitted to participate in its advantages and privileges. If a member, or a number of individuals, choose to abandon their church, they must at the same time be content to relinquish all its benefits.

But this is a question of fact, which you must decide. In this part of the case, the burthen of proof is thrown upon the respondents. They must satisfy you that such was the intention of the new school party in organizing the house and adjourning to the First Presbyterian church. But granting that the motion of Mr. Cleaveland was in order, that Drs. Beman and Fisher, and the clerks, had a majority of votes, that the intention was to organize the General Assembly, and that they did not intend an ex-parte organization, the respondents say that such was the precipitation and haste of these proceedings, their extraordinary and novel character, the noise, tumult and confusion, that they and the other members of the house had no opportunity of hearing and voting, if they had wished to do so, and that therefore this is an attempt at organization, which is null and void.

It is very certain that if individual members of a deliberative assembly, by trick or artifice, by surprise, noise, tumult, and confusion, carry such a question as this, it ought not, it cannot be regarded. The members must have an opportunity to debate, to vote, if they desire it, and for this reason it is that the negative question must be put, and that the several questions must be reversed.

It will be for you to say whether the members had this opportunity. To this part of the case I request your particular attention.

If you believe that the several motions were made and reversed, that they were carried by a majority of affirmative voices, whatever may be your opinion of the relative strength of the two parties in the assembly, your verdict must be for the relators. I hold it to be a most clear proposition, that silent members acquiesce in the decision of the majority. It is of no sort of consequence for what reason they were silent; whether from a previous determination or otherwise. The effect is the same, provided they had an opportunity of hearing and voting on the question. It is not necessary that all should hear or vote.

If persons who are members of an assembly, by surprise, by noise or violence, carry such a question—such a vote cannot be considered as the deliberate sense of the assembly; but when members are aware of the nature of the proceedings and choose to treat them with contempt, or to interrupt the business themselves, by stamping, noise, talking, cries of order, or shame! shame! or requesting silence with a view to interruption, or attending to other business, when

(The Commonweath v. Green.)

they ought to be attending to this, they cannot be permitted afterwards to allege that they had no opportunity to vote. They cannot take advantage of their own wrong or their own folly. In such a case, their silence, or if you choose, noise, shall be viewed as an acquiescence in the vote of the majority. But when members are prevented from hearing and understanding the question by the noise and confusion, or by the indecent haste with which the business is conducted, the organization is not such as can give it any legal validity. It is of no consequence whether the members are prevented from voting understandingly on the question by the persons engaged in conducting the business, or by the spectators. But when it comes from the members of the other party, they shall not be permitted to object, when they themselves are the causes of the difficulty.

If the facts be so, they (the members of the old school) did not hear, because they would not vote. They caused the disorder, and let them reap the bitter fruits of their injustice. The Court, and you gentlemen of the jury, have nothing to do with consequences, with fancied majorities and minorities, but with majorities legally ascertained. We are placed at this bar under an awful responsibility to do justice without regard to the numerical strength of the contending parties.

If you, gentlemen, believe that the questions were not reversed, that they were not carried, that the members of the assembly had not an opportunity of hearing and voting upon them, your verdict should be in favour of the respondents. But if, on the other hand, you believe they intended to organize the assembly; that the questions were severally put; that the noise, tumult and confusion which prevailed in the assembly, were the result of a preconcerted plan, or combination, or conspiracy between the clerks, the moderator, and the members of the old school party, to sustain the unconstitutional and void resolutions of 1837, which deprived members of seats to which they were justly entitled, your verdict should be in favour of the relators.

And here I do not wish to be understood as having expressed, or even intimated an opinion as to the facts of the case. The facts are for you, the law is for the Court."

The jury found a verdict of guilty; and the defendants moved for a new trial, and assigned the following reasons.

" 1. The judge erred in refusing to permit the defendants' counsel to cross-examine the plaintiffs' witnesses, touching a plan of action, concerted by these witnesses and others, previous to the 17th of May 1838, for the government, &c., of their conduct in or on the occasion of the organization of the General Assembly of the Presbyterian church, for the year 1838.

2. In refusing to permit the defendants to give evidence of the

concert, mentioned in the first point, and to explain the nature and character thereof.

3. In not charging the jury, upon certain points, submitted to him in writing, by the defendants' counsel; which points so submitted, are hereto annexed.

4. In refusing to permit the defendants to give evidence that the churches of the synods, which were disowned in 1837, had not contributed to the funds under the control of the General Assembly.

5. In not permitting the defendants to prove the existence of Congregational or mixed churches, within the bounds of the disowned synods, and in connexion with those synods.

6. In not permitting the defendants to prove, that many churches and ministers, had complied with the terms, by which the disowning resolutions, or acts, were qualified:—that they had applied to the presbyteries most convenient to their respective localities, and had been admitted into them.

7. In permitting the plaintiffs' concluding counsel, to read passages from the minutes of the old school General Assembly of 1838; which had not been given in evidence, particularly, as the plaintiffs had objected to the defendants reading the whole of these minutes in evidence, and this objection had been sustained by the Court.

8. In rejecting the deposition of Dr. Eliphalet Nott, except such part merely as narrated the transactions that took place at the organization of the General Assembly of 1838.

9. In charging the jury that the acts of the General Assembly of the Presbyterian church, of the year 1837, by which the synods of the Western Reserve, Genessee, Geneva, and Utica, and their component parts were disowned or declared to be no longer in ecclesiastical connexion with the Presbyterian church, were unconstitutional and void.

10. In charging the jury that the Plan of Union (so called) of 1801, was constitutional.

11. In charging the jury that the two reasons assigned by the General Assembly of 1837, declaring that Plan of Union to be unconstitutional, were not sufficient reasons; these reasons were as follows, viz:

    1st. Because they were important standing rules and adopted without being submitted to the presbyteries.

    2dly. Because the General Assembly of Connecticut was invested

with no power to legislate in such cases, and especially to enact laws to regulate churches not within their limits.

12. In charging the jury that said agreeement or Plan of Union, did not come within the words or spirit of that clause of the constitution of the Presbyterian church, which provides, " that before any overture or regulation proposed by the General Assembly to be established as constitutional rules, should be obligatory on the churches, it shall be necessary to transmit them to all the presbyteries, and to receive the returns of at least a majority of them, in writing, approving thereof." Nor was it (his honor charged the jury) in conflict with the constitution, before its amendment in 1821, which provides, " that no alteration shall be made in the constitution, unless two-thirds of the presbyteries under the care of the General Assembly, agree to alterations or amendments proposed by the General Assembly."

13. In charging the jury, " That the Plan of Union" was a regulation made by competent parties, and not intended by either as constitutional rules ; nor was it obligatory on any of the Presbyterian churches in their connexion.

14. In charging the jury, " That that part of the agreement, (Plan of Union) that the standing committee of the Congregational churches, consisting partly of Presbyterians, and partly of Congregationalists, may or shall attend the presbytery, &c. and may have the same right to sit and act in the presbytery, as a ruling elder, was intended as a safeguard to the rights of all the parties to be affected by it.

15. In charging the jury, that " I view it" (Plan of Union,) " as a matter of discipline, and not of doctrine ; the effect of which is to exempt those members of the different communions who adopt it, from the censures of the church to which they belonged; and particularly, the clerical portion of them."

16. In not permitting the defendants to prove that there were, at the time of the disowning acts, numbers of Congregational churches, and churches on the mixed plan, within the bounds of those synods so disowned; and that these churches were represented in the presbyteries composing these synods, by unordained lay delegates.

17. In not permitting the defendants to prove, that at the date of the disowning acts, there were, within the bounds of the disowned synods, numerous churches on the mixed and congregational plan ; formed under the act of union of 1801, and connected, by means of that act, with the Presbyterian church.

18. In charging the jury, " That after an acquiescence of nearly forty years, and particularly after the adoption by the presbyteries,

(The Commonwealth *v.* Green.)

of the amended constitution of 1821, the Plan of Union is not now open to objections. The plan has been recognized by the presbyteries at various times, and in different manners, under their old and amended constitution. It has been acted upon by them, and the General Assembly in repeated instances; and is equally as obligatory as if had received the expresss sanction of the presbyteries, in all forms known to the constitution."

19. In taking from the jury the question of acquiescence by the presbyteries, in the Plan of Union of 1801. The facts of recognition, or forbearance, which enter into the idea of acquiescence, were facts for the jury. To support the position of acquiescence, it was necessary that the presbyteries which were declared to have acquiesced, should have had full knowledge, or the means of knowledge, that there were churches and presbyteries formed on the Plan of Union, and claiming rights under the Plan of Union. The existence of such knowledge, or means of knowledge, is a fact for the determination of the jury.

20. In charging the jury that the "Plan of Union" did not provide that the delegates from standing committees from mixed churches under the plan of Union to the presbyteries, should exercise the same rights as ruling elders in those presbyteries.

21. In charging the jury that it was unjust in the General Assembly to repeal the Plan of Union, without saving the rights of existing ministers and churches.

22. In charging the jury that there had been acquiescence in the rights claimed under the Plan of Union for thirty-six years; there being no proof that any of the churches formed upon that plan, had existed thirty-six years.

23. In charging the jury in regard to the fourth resolution, which provides the method by which churches, ministers and presbyteries within the disowned synods, who are strictly Presbyterian in doctrine and order, may continue their connexion with the General Assembly, and the Presbyterian church, inasmuch as he represents, that it only provides for the presbyteries, and omits the provisions in favour of churches and ministers.

24. In charging the jury that the resolutions of 1837, disowning the four synods, were in the nature of judicial proceedings, and that the presbyteries within the four synods, were treated as criminals and offenders against the rules, regulations, and doctrines of the church.

25. In charging the jury in regard to the resolutions of 1837, "That the proper steps be now taken to cite to the bar of the next assembly, such inferior judicatories as are charged, by common

fame, with irregularities, &c. ;" that nothing further appears to have been done in this matter in the General Assembly.

26. In charging the jury that the proceedings of the General Assembly of 1837, in regard to four synods, were not, nor was any part of them, conclusive in this collateral inquiry.

27. In charging the jury that to effect the objects proposed by the disowning resolution of 1837, it was necessary that citations should have issued to the presbyteries within the bounds of these synods; and that all the other judicial process prescribed in the book of discipline, should have been resorted to.

28. In charging the jury that the disowning of these synods was depriving electors of their right to vote; and in declaring that it was not distinguishable from an attempt by the legislature of Pennsylvania, by resolution, or otherwise, to deprive one of the jurors of his right as an elector.

29. In charging the jury, that " The presbyteries, by the constitution of the church, are the electors of the General Assembly; their right has been taken away without trial, and, so far as we know, without the examination of a single witness."

30. In charging the jury, that it is now immaterial whether the presbyteries in the disowned synods have Congregational churches in their connexion or not; and that it was possible, if a trial had been had, that fact might have been disproved; " at any rate, it would be a singular reason for ejecting a whole presbytery, because a single church was governed without the benefit of ruling elders."

31. In charging the jury, that although he was of opinion that the introduction of lay delegates from Congregational establishments, into the judicatories of the Presbyterian Church, was a violation of the fundamental principles of Presbyterianism, and in contradiction to the act of the legislature of Pennsylvania incorporating the trustees of the church; and that any act permitting such introduction, would be void, although submitted to the presbyteries; yet he was unable to see the bearing of this proposition on the matter in issue in this cause.

32. In charging the jury, that although the General Assembly is entitled to decide on the right claimed by any one to a seat in that body; yet that, unlike legislative bodies, their decision is the subject of revision; and that ecclesiastical judicatories are subject to the control of the law.

33. In charging the jury, that a mandamus would not reach this case; for, before the remedy could be applied, the General Assembly would be dissolved, and it would be impossible to foresee whether

the next assembly would persist in their illegal and unconstitutional course of conduct.

34. In permitting evidence to be given on the issue joined in this case, of the proceedings, actings, and doings of the General Assembly of the year 1837.

35. In charging the jury, " That the committee of commissions grossly erred in refusing to put the names of the commissioners from the four synods, on the list of rejected applications. It was their duty to decide on the propriety of the application, and to refer the decision to the further action of the house, by adding their names to the roll of members whose commissions had been examined and rejected."   " It is, therefore, the opinion of the Court, that in this there was a palpable violation of the rights of the proscribed commissioners."

36. In referring it to the jury to decide, whether the proper course of those whose commissions had been rejected by the committee of commissions, was to have the same referred to the committee of elections or not.

37. In charging the jury, " that Dr. Elliott's declining to put Dr. Mason's appeal, was a dereliction of duty—a usurpation of authority, which called for the censure of the house; that he could not then allege, that there was no house to which the appeal could be taken.   At that time, the clerks had made their report, and it was ascertained what members had a right to vote."

38. In repeatedly stating to the jury, " that sixty thousand communicants had been cut off from the body of the Presbyterian Church," there not being any evidence to that effect.

39. In committing to the jury to find, whether Dr. Elliott " was performing his duty as the presiding officer of the house, or was he carrying out the unconstitutional and void proceedings of the General Assembly of 1837."

40. In charging the jury, " that there is nothing in the constitution of the church, which restrains or impairs the right of the house to depose their moderator for sufficient cause; whether he be moderator for the session or for the organization."

41. In charging the jury, " that the house was not restricted in their choice of a moderator, to a moderator of a former year who may be present; that rule applies only to ordinary cases, when the moderator of the last year is not in attendance, or is unable, from some physical reason, to discharge the duties of the office.   It does not apply in the peculiar and extraordinary circumstances of this case."

(The Commonwealth v. Green.)

42. In charging the jury, " that Mr. Cleaveland had a right to make the motion, that Mr. Beman take the chair—that said question need not, under the circumstances of the case, be put by the clerks, or one of them—that the question amounted to this, viz. that Dr. Elliott, who occupied the chair, should be deposed, and that Dr. Beman should be elected in his stead—that it was a pertinent question, easily understood and not calculated to mislead the dullest member of the assembly. It was in a proper form and in a proper time : for, gentlemen, it was not necessary, to precede it by a motion, that the house should now proceed in the choice of a moderator. All things requisite are substantially comprised in the motion which was made."

43. In charging the jury, " that the refusal of the moderator to put the appeal was a breach of privilege, in which not only Dr. Mason but the whole house was interested; they might have proceeded against him for a breach of privilege, or they might depose him on the ground of partiality and injustice."

44. In charging the jury, " there was nothing in the question or in the manner of putting it which was disorderly, or which ought to have led to disorder."

45. In charging the jury, that the motion of Mr. Cleaveland, and the subsequent resolutions or motions, were the consequence of the decision of the moderator, that Dr. Mason's motion was out of order, and refusal of the moderator to allow an appeal to the house. The right of members was unjustly invaded, and from this moment it became a question of privilege, which over-rides all questions whatever. A question of privilege is always in order, to which privilege, questions such as the appointment of a committee of elections, might give way, The cry, therefore of ' order' from the moderator or from any member whatever, under such circum-stances would be disorderly."

In charging the jury, that " Dr. Mason had the right to make his motion before the appointment of the committee of elections. Indeed, I know of no other mode of getting this question before the com-mittee of elections, except by bringing it before the house, who might either decide it themselves, or if they thought proper, refer it to that committee, on whose report it would again come before the house."

47. In charging the jury, " that the fact that Mr. Cleaveland put the question, instead of the moderator ; the cries of ' order' when this was in progress, the omission of some of the formalities usually observed when there is no contest, and no excitement; such as standing in the aisle, instead of taking the chair occupied by the moderator; not using the usual insignia of office, &c. ; putting the

(The Commonwealth v. Green.)

question from an unusual place; and the short space of time which was consumed in the organization of the house; and three or more members standing at the same time; would not vitiate the organization, if you should be of opinion, that this beeame necessary, from the illegal and improper conduct of the adverse party."

48. In charging the jury, "that this part of the respondent's case, rests upon standing rules that were not then in existence. You will recollect that each-assembly adopts its own rules."

49. In charging the jury, "that the roll of members reported by Mr. Krebs, and Dr. M'Dowell, was the roll of the house. As such, it was virtually in the possession of the clerks afterwards chosen, provided they were regularly and duly elected."

50. In charging the jury, "that the existence of a house competent to perform all the functions of the General Assembly, does not depend on the observance or non-observance, of the standing orders of the house. You must take this opinion with qualifications," &c.

51. In charging the jury, "in application to this case, that affirmative testimony is more to be relied on than negative testimony."

52. In charging the jury that the proceedings of the General Assembly, of 1837, had a bearing or operation on the General Assembly of 1838, or that a design, by any portion of the members of the Assembly of 1838, to carry into effect the acts of the assembly of 1837, could have any effect upon the organization of 1838, or confer rights upon any person whatever to violate or set aside rules of order.

53. The verdict of the jury is not a proper finding upon the point in issue between the parties.

54. The respondents having pleaded severally, to the information or suggestion filed in this case, and have different defences to the same, the verdict is erroneously given against them jointly.

55. The verdict of the jury is against law and the evidence.

56. His honor, the judge, erred in not putting the position of the defendants, in regard to the design of the "new school party," fully to the jury. The defendants contended, among other things, that the "new school party," designed to form an organization, in despite of and against the will of the majority, however expressed; and that Mr. Cleaveland's motion was not addressed to them, and had they voted negatively on the same, their votes would not have been regarded.

57. In charging the jury that the real state of the parties as to

majority or minority, was in no: respect to be regarded, that the majority was only to be known by the vote."

The following additional specifications were filed.

" 1. The resolutions adopted by the General Assembly of 1837, were within its jurisdiction as an ecclesiastical tribunal, and were duly passed ; and they were not subject to the control or decision of the Courts of justice.

2. The language of the moderator in the preliminary assembly of 1837, in addressing the Rev. Mr. Squiers, was not precisely or even substantially the language quoted by the judge.

3. The judge erred in omitting to give due effect (in the proceedings of 1838,) to the fact that the members did not understand, and could not hear the propositions, which are said to have been submitted to them ; and in pronouncing the call to order by individuals of the ' old school party' itself, out of order.

4. The evidence was clear positive and unquestionable, that no opportunity was given to the members who attended in 1838, to debate the propositions that are said to have been introduced ; yet the judge withdrew the attention of the jury from the true point, which was, that there being no opportunity for debate whether the proceedings were thereby vitiated.

5. The judge omitted to charge, that in a scene of tumult and disorder, such as was admitted on all sides to exist, there was necessarily a suspension of effectual measures, and that any thing which ocurred at such a juncture was without operation or effect.

6. The judge charged, that if the organization of the ' new school porty' was intended to be exparte, with a view to a separation, the General Assembly so organized, could not be recognized, &c. ; yet he refused to permit evidence to be given by the defendants of the circumstances that attended that organization, and of the intention of the 'new school' party, as manifested by their preliminary acts and declarations.

7. The judge erred in declaring, that if the members had an opportunity of hearing and voting, the majority of those entitled to vote, and who actually voted, is to be counted ; and that it is of no sort of consequence, for what reason the silent members are silent. Whereas, the silence may have proceeded from an inability to know what were the measures proposed, and that inability produced by the precipitancy and disorder of the ' new school' party : and the omission to vote might have proceeded from the calls to ' order' on the part of a presiding officer yet occupying the chair.

8. The burthen of proof rested on the party objecting to the resolutions of 1837, to show the invalidity of these resolutions ; every

(The Commonwealth *v.* Green.)

fair presumption being in their favour; yet no proof whatever was given of the facts alleged in the protest of the 'new school' party, as sufficient to impair the resolutions."

Mr. *F. W. Hubbell* and Mr. *Sergeant*, (Mr. *Preston*, of South Carolina, and Mr. *J. R. Ingersoll*, were with them,) were heard in support of the rule.  They argued,

1.  That the plan of union was unconstitutional and void.  Because it materially modified the constitution of the Presbyterian church, by introducing unordained lay delegates into the presbyteries. Because it deprived Presbyterians of the right of appeal from the decisions of the presbyteries.  Because it gave individuals who were not Presbyterians, a *status* in the Presbyterian church.  These modifications were not submitted to the presbyteries, who alone can change the constitution in its alterable parts.  But these alterations were inadmissible, even with the sanction of the presbyteries, as the provisions are part of the tenets of the church, and deemed of apostolical origin.  Besides, the act of the legislature of Pennsylvania incorporated a *Presbyterian* church; it will, therefore, admit of no changes which destroy the Presbyterial character of the church.

2d.  If the plan of union were not unconstitutional, still it was a mere temporary arrangement, capable of being revoked by either party at pleasure.

3d.  The acts called the exscinding acts, were merely acts of dissolution.  The General Assembly having the power to create synods and presbyteries, have likewise power to dissolve or destroy them, by an implication as cogent as that which attaches the power of removal to the power of appointing.  The power to create synods is express; that of creating presbyteries is evidenced by long exercise.  If these acts were within the scope of any of the powers of the General Assembly, this Court cannot inquire into the propriety of its exercise.  This principle extends to the legislation and the judicial acts of all associations, while they confine themselves to the exercise of the powers given by their compact.  This principle applies with the greater intensity to ecclesiastical associations which are protected from interference by the 3d section of the bill of rights.  (MS. Case of the Rev. *Francis Hindman*, Supreme Court of Delaware, 1812.)  *Black and Whitesmith's Society* v. *Vandyke*, (2 *Wharton*, p. 309.)

4th.  Those exscinding acts were just, proper and expedient. The synods in question were composed in a great measure of congregational churches, i. e. churches not governed by ruling elders, as we offered to prove, and our testimony being rejected, have a right to assume and take for granted.  The faith and constitution of the church required that they should be eradicated.  It could not be done by judicial process, because congregationalism had been sanctioned by the General Assembly itself, in the plan of union.  It was therefore no offence which could be the subject of judicial

(The Commonwealth v. Green.)

action. Neither synods nor presbyteries, which are mere incorporeal existencies, could be made the subject of judicial action or punishment. The only mode by which the congregationalism in these synods, so intimately blended with presbyterianism, could be expurged, was by dissolving the synods, and receiving the several portions into some other synod. This was amply provided for by the resolutions in question.

5th. The proceedings of the new school party in 1838, were a mere disorder or secession, even if we should concede the exscinding acts to be illegal, for it is manifest that it was only intended as a minority organization; and the calling it an organization of the whole, is an after-thought, a mere quibble upon that rule of order which counts silence as an affirmative vote.

6th. Mr. Cleaveland's motion was not justified by any outrage of the rights of the minority, by the moderator and clerks. The clerks, acting as a committee of commissions, exercised a legitimate power in deciding against the commissions from the exscinded synods. Mr. Patton's motion was properly rejected, the roll not having been reported; and therefore there were, constitutionally, no members whom the moderator could recognize. Dr. Mason's motion and appeal were properly rejected, because the roll was not then completed and who were entitled to vote ascertained, and the moderator was calling the commissioners who had not had an opportunity of presenting themselves for enrolment, to come forward for that purpose. The motion was beside irregular, because the first business to be transacted by the house, according to the standing rules of 1826, was the appointment of a committee of elections.

7th. The proceeding of Mr. Cleaveland, was, in every respect, disorderly. It was out of time; the first business being the appointment of a committee of elections. His motion was not addressed to the moderator. It was not put to the house by the moderator. It proposed the election of a provisional moderator, while Dr. Elliott remained in the chair unremoved. Our adversaries attempt to justify these irregularities by assuming that the refusal of Dr. Mason's appeal was a breach of privilege, and that questions of privilege over-ride all rules of order, and that Mr. Cleaveland's motion was a punitory proceeding to redress the wrong. Unhappily for this argument, besides its other infirmities, Mr. Cleaveland's motion did not profess to relate to Dr. Mason's motion, but claimed to be the commencement of a new organization.

8th. Mr. Cleaveland's motion was fundamentally wrong on other grounds. Dr. Elliott being the moderator of the preceding session, and the constitutional organ to preside until a new, permanent moderator was elected, held his office independently of the inorganic body over which he presided. But even if capable of removal, the constitution and by-laws pointed out the last preceding moderator

(The Commonwealth *v.* Green.)

present as his succesor. It is in proof that three moderators were present, who had held the office more recently than Dr. Beman.

9th. Our adversaries attempt to justify the putting of the question by Mr. Cleaveland, because it touched the removal of the moderator, and it would be incongruous for him to put the question himself. In case of the incapacity of the moderator, all parliamentary practice, and the practice of this very body, designate the clerk as the proper individual to put the question. *Minutes of General Assembly of* 1835. 2 *Hatsell*, 113. 6 *Gray*, 406, 448. 2 *Hatsell*, 211, 212. *Sutherland*, 71, 72. *Jefferson*, 104.

10th. Although confessedly but a minority voted on Mr. Cleaveland's motion, yet our adversaries make it a majority by counting the dissentients as silent votes. In order successfully to invoke this principle, they must show that the question was put at the proper time and by the proper person; also that it was perfectly intelligible, and pronounced so loudly, as to be heard, and so deliberately as to be understood. Mr. Cleaveland's motion was the contrary of all this,—it was low, it was rapid; above all, it was deceptive in its terms, if it were meant for what it is now asserted to be. In its terms it proposed a new organization; the party had previously in the ircaucus, resolved on a new minority organization, and no commissioner present at the organization, could have dreamed of any other conclusion. Had the majority not been deceived, they could have voted down the motion.

11th. The propriety and necessity of these exscinding acts, is particularly apparent from the abuses which have been practised under the pretence of the plan of union. In the synod of the Western Reserve, as was admitted on the floor of the General Assembly, out of the one hundred and thirty-nine churches composing that synod, there are one hundred and nine which are Congregational, and yet in the statistical reports made to the General Assembly, from the presbyteries composing that synod, they are all, illusively, represented to be Presbyterian churches. So, also, in the reports from the presbyteries in the other synods in question, churches proved to be congregational, are represented to be Presbyterian. This abuse, though emanating from the plan of union, cannot be justified upon that plan; nor these illusory reports upon the common principles of morals.

Mr. *Meredith* and Mr. *Randall*, (with whom was Mr. *Wood*, of New York,) for the relators, showed cause against the rule. They argued—*

1. That the plan of union between the General Association of Connecticut, and the General Assembly of the Presbyterian Church in the United States of America, was constitutional. It had

---

* This statement of the argument of the counsel for the relators, was furnished by Josiah Randall, Esq.

existed previous to the Revolution, had been suspended during the war, and again, at the invitation of the General Assembly, proposed immediately on the passage of the law incorporating that body. Similar arrangements had been proposed or entered into by the General Assembly with the Associations of Vermont, Massachusetts, New Hampshire, the Dutch Reformed Church, and the Associate Reformed Church.

2. That the objection that the plan of union should be sent down to the presbyteries for approval, was of no avail. The provision in the constitution which requires amendments to be sent down to the presbyteries, relates to general regulations and not to the admission of an individual or a body of individuals into the church. That the practice of the General Assembly had been uniform on this subject in all instances. Resolutions admitting delegates from corresponding bodies to sit and vote, had been adopted and repealed without sending them down to the presbyteries. The regulations admitting ordained ministers and elders from other protestant churches, without reordination, had been adopted in the same manner, although the General Assembly had for a series of years theretofore refused such admission. That a considerable portion of the present church now held their seats by the same tenure under the union with the Associate Reformed Church, including the moderator of 1836, (Dr. Phillips), and the gentleman who officiated as chairman of the committees appointed on this subject by the General Assembly of 1837, (Dr. Judkin.) That Dr. Green had declared that the legality of the union with the Associate Reformed Church, had never been denied. That at all events an acquiescence of thirty-six years removed all such objections; that the amended constitution of 1821, had incorporated all these materials as a part of the church; that every presbytery in the church had recognised the plan of union, and that subsequent ratification amounted to previous assent.

3. That the plan, in itself, was not only judicious, but constitutional, and has been found most useful. 1st, It recommended a presbyterian minister, when an opportunity presented itself, to preach to a Congregational church, or a congregation partly Congregational and partly Presbyterian. And 2nd, In case of difficulty between the minister and his congregation, it authorised several modes of arbitrament to be adopted by the parties, for an amicable settlement of their disputes, one of which, in an appeal to the presbytery, permitted a member of the standing committee of a mixed church to sit and vote as an ordained elder.

4. That the character of this plan had been totally misunderstood. It related to the "frontier settlements" generally, and not the western part of New York, and the Western Reserve of Ohio. That so far from its authorising the admission of any Presbyterian minister into the church, it could not operate upon nor affect him till

(The Commonwealth *v.* Green.)

he had become previously, by ordination, a regular Presbyterian minister in good standing. That it had been proved, and was not denied, that the whole five hundred and seventeen ministers were regularly ordained ministers, exclusive from and independent of the plan of union. That if the plan had been found inconvenient, or was believed to be unconstitutional, the proper mode was to repeal it; and then, if any presbyterian minister should violate the rules of the General Assembly, by continuing pastor of a Congregational or mixed church, he would become obnoxious to censure, and excommunication from the church, according to its forms of judicature.

5. That as it now stood, the General Assembly had in 1801, 'enjoined' and 'recommended' Presbyterian ministers to preach to Congregational and mixed churches, and in 1837, without notice, had excluded ministers for obeying the injunctions and recommendations of the General Assembly.

6. That the exscinding resolutions were contrary to all law, human and divine, and were utterly unconstitutional and void. It excluded five hundred and nine ministers, the elders of five hundred and ninety-nine churches, and sixty thousand communicants, without accusation, notice or trial. It was founded on no principle; the present synod of Albany had been left untouched, while its offspring, the three synods of Geneva, Genessee and Utica, had been cut off. The synod of the Western Reserve had been first created out of the Pittsburg synod, and the synod of Michigan has been subsequently created out of the synod of the Western Reserve, and while the intermediate synod of the Western Reserve had been cut off, the synods of Pittsburg and Michigan have remained untouched. It was a local desecration of the ground; expulsion from the church depended on the domicil of the member in 1837, and had Dr. Green at that time lived in the western part of the state of New York, or in the Western Reserve of Ohio, he would have been excluded among the rest. It excluded all indiscriminately, whether they have ever been connected with the plan of union or not.

7. That in the year 1799, before the adoption of the constitution, the presbytery of New York included twenty-one churches, of which eleven are among the number of exscinded churches, and although some of these churches were in existence before any individual who voted for these exscinding resolutions was a member of the church, and these churches had continued to exist without interruption, and have been recognized by the General Assembly, as such, without any regard to the plan of union. That the General Assembly of 1837, have admitted that whole presbyteries and churches within the proscribed and infected districts, were regular and in good standing; and provided also a mode for their re-admission into the church. That the alleged exclusion for a day, a month, a year, or for life, were equally a violation of the right of the exscinded indi-

viduals or bodies. That this mode of re-ingress into the church was illusory, as the exscinded individuals could obtain re-admission only by examination in the same manner as if they had never been connected with the church. That the opening counsel had not denied the right of the Court to inquire into the form of proceedings of the General Assembly, and that the case cited by the concluding counsel of Mr. Hindman was conclusive in favour of the power of the Court; as the Supreme Court of Delaware there refused the mandamus, because the relator had confined his application for restitution to the presbytery, as an ecclesiastical body, and not to the presbytery as an incorporated body, and the Court there said that they would have entertained jurisdiction, if the application had been for restoration to the incorporated presbytery. That the case referred to in Mr. Hindman's case, of *The Commonwealth of Pennsylvania v. Richards and others*, decided in 1790, by the Supreme Court of Pennsylvania, on a mandamus to return Mr. Marshall as minister to the Scots' Presbyterian church in Spruce street, was conclusive and unanswerable in favour of the right. That if this power were not conceded, there would be no remedy for a relief from ecclesiastical tyranny and injustice, no matter how unjust and irregular it might be.

8. That the act of the clerks in excluding the commissioners from the roll, and refusing to report them to the assembly, and the subsequent conduct of the moderator in refusing to put the motions made to rectify the misbehaviour of the clerks, were overt acts of a conspiracy to carry out the unconstitutional acts of 1837; and that the refusal of the moderator to put the appeal of Dr. Mason to the assembly, was a breach of privilege which authorized any member of the assembly to move for his dismission from office.

9. That Mr. Cleaveland's motion was substantially a proceeding to remove Dr. Elliott from office for this breach of privilege. That privileged questions over-ride all the ordinary rules of order.

10. That Mr. Cleaveland's motion was perfectly intelligible, and sufficiently loud to be heard by all. That every member had therefore an opportunity to vote, and if under such circumstances they were silent, they must be presumed to have acquiesed.

11. That according to parliamentary rules, when the commissions of the commissioners to the General Assembly of 1838, were committed to the committee of commissions, they could only be restored to the assembly for the assembly's action, by the report of that committee. That therefore the conduct of the clerks composing the committee of commissions, in refusing to report the commissions from the four synods on either of their lists, was a gross violation of duty.

12. That the remedy to which the relators had resorted, viz. this proceeding of *Quo Warranto*, was both legal and proper.

13. That the moderator could not without absurdity, put the

(The Commonwealth v. Green.)

question for his own removal; nor did that office, under such circumstances, devolve upon the clerks. They were *participes criminis*, and would not have put the motion if they had been required. That the precedents of motions put by them were, where they were specially authorized by the house to put the questions.

14. That every deliberative body which elects its own chairman, has the right to depose him for misconduct. That the moderator of the preceding assembly, presiding over the organization of the succeeding assembly, is by no means exempt from this power. He is designated to the office for the sake of convenience, but those for whose convenience he holds the office, are his masters, and not he theirs.

The following cases were cited on the part of the relators. *Rex v. Harman,* (7 *Mod.* 332.) *Rex v. Geneva,* (6 *T. R.* 735.) *Symmes v. Regem,* (*Cowp.* 489, 507.) *Rex v. Fencroft,* (2 *Burr.* 1017, 1020.) *Claridge v. Evelyn,* (5 *B. & Ad.* 86.) *Rex v. Parry,* (14 *East,* 559. *in notes,* 561.) *Rex v. Hawkins,* (10 *East,* 214.) *Oldknow v. Wainwright,* (2 *Burr.* 1026.) *Rex v. Monday,* (*Cowp.* 530.) *Baggs's case,* (11 *Rep.* 99.) *Commonwealth v. St. Patrick's Society,* (2 *Binn.* 448.) *Commonwealth v. Guardians,* (6 *Serg. & Rawle,* 496.) *Townsend's case,* (*Ld. Raym.* 69.) *Commonwealth v. Arrison,* (15 *Serg. & Rawle,* 127.) *Austin v. Osborne,* (*Comyn's Rep.* 234.) 2 *Hatsell,* 113, 108, 114, 201, *and seq.* 4 *Cobbett's Parliamentary History,* 591. 2 *Hatsell,* 85, 237.   4 *Cobbett,* 1002.   4 *Cobbett,* 898, 925, 929.   4 *Cobbett,* 1092.   2 *Hats.* 207, 211, 212, 257.   2 *Cobbett,* 487, 488, and 2 *Hats.* 227.   2 *Cobbett,* 504, 552, 685, 694.

The opinion of the Court was delivered by

Gibson, C. J.—To extricate the question from the multifarious mass of irrelevant matter in which it is enclosed, we must, in the first place, ascertain the specific character of the General Assembly, and the relation it bears to the corporation which is the immediate subject of our cognizance. This assembly has been called a *quasi* corporation; of which it has no feature. A *quasi* corporation has capacity to sue and be sued as an artificial person; which the assembly has not. It is also established by law; which the assembly is not. Neither is the assembly a particular order or rank in the corporation, though the latter was created for its convenience; such, for instance, as the shareholders of a bank or joint stock company, who are an integrant part of the body. It is a segregated association, which, though it is the reproductive organ of corporate succession, is not itself a member of the body; and in that respect it is anomalous. Having no corporate quality in itself, it is not a subject of our corrective jurisdiction, or of our scrutiny, further than to ascertain how far its organic structure may bear on the question of its personal

(The Commonwealth v. Green.)

identity or individuality. By the charter of the corporation, of which this is the handmaid and nurse, it has a limited capacity to create vacancies in it, and an unlimited power over the form and manner of choice in filling them. It would be sufficient for the civil tribunals, therefore, that the assembled commissioners had constituted an actual body: and that it had made its appointment in its own way, without regard to its fairness in respect to its numbers: with this limitation, however, that it had the assent of the constitutional majority, of which the official act of authentication would be, at least, *prima facie* evidence. It would be immaterial to the legality of the choice that the majority had expelled the minority, provided a majority of the whole body concurred in the choice. This may be safely predicated of an undivided assembly, and it would be an unerring test in the case of a division, could a quorum not be constituted of less than such a majority; but unfortunately, a quorum of the General Assembly may be constituted of a very small minority, so that two, or even more distinct parts may have all the external organs of legitimate existence. Hence, where, as in this instance, the members have formed themselves into separate bodies, numerically sufficient for corporate capacity and organic action, it becomes necessary to ascertain how far either of them was formed in obedience to the conventional law of the association, which, for that purpose only, is to be treated as a rule of civil obligation.

The division, which for purposes of designation, it is convenient to call the old school party, was certainly organized in obedience to the established order: and, to legitimate the separate organization of its rival, in contravention, as it certainly was, of every thing like precedent, would require the presentation of a very urgent emergency. At the stated time and place for the opening of the session, the parties assembled, without any ostensible division; and, when the organization of the whole had proceeded to a certain point, by the instrumentality of the moderator of the preceding session, who, for that purpose, was the constitutional organ, a provisional moderator was suddenly chosen, by a minority of those who could be entitled to vote, including the exscinded commissioners. The question on the motion to elect, was put, not by the chair, but by the mover himself; after which the seceding party elected a permanent moderator, and immediately withdrew, leaving the other party to finish its process of organization, by the choice of its moderator for the session.

In justification of this apparent irregularity, it is urged that the constitutional moderator had refused an appeal to the commissioners in attendance from his decision, which had excluded from the roll the names of certain commissioners who had been unconstitutionally severed, as it is alleged, from the Presbyterian connexion by a vote of the preceding session. It is conceded by the argument, that if

the synods with the dependent Presbyteries by which those commissioners were sent, had been constitutionally dissolved, the motion was one which the moderator was not bound to put, or the commissioners to notice; and whatever implication of assent to the decision which ensued, might otherwise be deduced from the silence of those who refused to speak out, about which it will be necessary to say something in the sequel, there was no room for any such implication in the particular instance. It would follow also, that there was no pretence for the deposal of the moderator, if indeed such a thing could be legitimated by any circumstances, for refusing an appeal from his exclusion of those who had not colour of title, and, consequently, that what else might be reform, would be revolution. And this leads to an inquiry into the constitutionality of the act of excision.

The sentence of excision as it has been called, was nothing else than an ordinance of dissolution. It bore that the synod in question, having been formed and attached to the body of the Presbyterian church, under, and in execution of, the plan of union, " be, and are hereby declared to be, out of the ecclesiastical connexion of the Presbyterian church in the United States of America; and that they are not in form or in fact, an integral portion of said church." Now it will not be said that if the dissolved synods had no other basis than the plan of union, they did not necessarily fall along with it, and it is not pretended that the Assembly was incompetent to repeal the union prospectively, but it is contended that the repeal could not impair rights of membership which had grown up under it. On the other hand, it is contended that the plan of union was unconstitutional and void from the beginning, because it was not submitted to the presbyteries for their sanction; and that no right of membership could spring from it. But viewed, not as a constitutional regulation, which implies permanency of duration, but as a temporary expedient, it acquired the force of a law without the ratification of those bodies. It was evidently not intended to be permanent, and it consequently was constitutionally enacted and constitutionally repealed by an ordinary act of legislation; and those synods which had their root in it, could not be expected to survive it. There never was a design to attempt an amalgamation of ecclesiastical principles which are as immiscible as water and oil; much less to effect a commixture of them only at particular geographical points. Such an attempt would have compromised a principle at the very root of Presbyterian government, which requires that the officers of the church be set apart by special ordination for the work. Now, the character of the plan is palpable, not only in its title and provisions, but in the minute of its introduction into the assembly. We find in the proceedings of 1801, page 256, that a committee was raised " to consider and digest a plan of government for the churches in the *new settlements*; agreeably to the

(The Commonwealth *v.* Green.)

proposal of the General Association of Connecticut;" and that the plan adopted in conformity to its report, is called "a Plan of Union for the New Settlements." The avowed object of it was to prevent alienation—in other words, the affiliation of Presbyterians in other churches, by suffering those who were yet too few and too poor for the maintenance of a minister, temporarily to call to their assistance the members of a sect who differed from them in principles, not of faith, but of ecclesiastical government. To that end, Presbyterian ministers were suffered to preach to Congregational churches, while Presbyterian churches were suffered to settle Congregational ministers; and mixed congregations were allowed to settle a Presbyterian or a Congregational minister at their election, but under a plan of government and discipline adapted to the circumstances. Surely this was not intended to outlast the inability of the respective sects to provide separately for themselves, or to perpetuate the innovations on Presbyterial government, which it was calculated to produce. It was obviously a missionary arrangement from the first; and they who built up presbyteries and synods on the basis of it, had no reason to expect that their structures would survive it, or that Congregationalists might, by force of it, gain a foothold in the Presbyterian church despite of Presbyterial discipline. They embraced it with all its defeasible properties plainly put before them; and the power which constituted it might fairly repeal it, and dissolve the bodies that had grown out of it, whenever the good of the church should seem to require it.

Could the synods, however, be dissolved by a legislative act? I know not how they could have been legitimately dissolved by any other. The assembly is a homogeneous body, uniting in itself, without separation of parts, the legislative, executive and judicial functions of the government; and its acts are referable to the one or the other of them, according to the capacity in which it sat when they were performed. Now had the exscinded synods been cut off by a judicial sentence without hearing or notice, the act would have been contrary to the cardinal principles of natural justice, and consequently void. But though it was at first resolved to proceed judicially, the measure was abandoned; probably because it came to be perceived that the synods had committed no offence.

A glance at the plan of union is enough to convince us that the disorder had come in with the sanction of the assembly itself. The first article directed *missionaries* (the word is significant) to the new settlements to promote a good understanding betwixt the kindred sects. The second and third permitted a Presbyterian congregation to settle a Congregational minister, or a Presbyterian minister to be settled by a Congregational church; but these provided for no recognition of the people in charge as a part of the Presbyterian body—at least they gave them no representation in its government. But the fourth allowed a mixed congregation to settle a minister of

either denomination; and it committed the government of it to a standing committee, but with a right to appeal to the body of male communicants, if the appellant were a Congregationalist, or to the presbytery, if he were a Presbyterian. Now it is evident the assembly designed that every such congregation should belong to a presbytery as an integrant part of it; for if its minister were a Congregationalist, in no way connected with the Presbyterian church, it would be impossible to refer the appellate jurisdiction to any presbytery in particular. This alone would show that it was designed to place such a congregation in ecclesiastical connexion with the presbytery of the district; but it is not all. It was expressly provided in conclusion, that if the " said standing committee of any church shall depute one of themselves to attend the presbytery, he may have the same right to sit and act in the presbytery as a ruling elder of the Presbyterian church." For what purpose, if the congregation were not in Presbyterial fellowship?

It is said that this *jus representationis* was predicated of the appeal precedently mentioned; and that the exercise of it was to be restrained to the trial of it. The words, however, were predicated without restriction; and an implied limitation of their meaning, would impute to the assembly the injustice of allowing a party to sit in his own cause, by introducing into the composition of the appellate court, a part of the subordinate one. That such an implication would be inconsistent with the temper displayed by the assembly *on other occasions,* is proved by the order which it took as early as 1791, in the case of an appeal from the sentence of the Synod of Philadelphia, whose members it prevented from voting on the question, (Assembly's Digest p. 332;) as well as by its general provision, that members of a judicatory may not vote in the superior judicatory on a question of approving or disapproving their records. (Id. page 333.)

The principle has since become a rule of the constitution, as appears by the Book of Discipline, Chap. VII. Sect. 3, paragraph 12. As the representatives of those anomalous congregations, therefore, could not sit in judgment on their own controversies, it is pretty clear, that it was intended they should be represented generally, else they would not be represented at all in the councils of the church, by those who might not be Presbyterians; and that to effect it, the principle of Presbyterial ordination was to be relaxed, as regards both the ministry and eldership; and it is equally clear that had the synods been cited to answer for the consequent relaxation as an offence, they might have triumphantly appeared at the bar of the assembly with the plan of union in their hand. That body, however, resorted to the only constitutional remedy in its power: it fell back, so to speak, on its legislative jurisdiction, in the exercise of which, the synods were competently represented and heard by their commissioners.

(The Commonweath v. Green.)

Now the apparent injustice of the measure arises from the contemplation of it as a judicial sentence pronounced against parties who were neither cited nor heard; which it evidently was not. Even as a legislative act, it may have been a hard one, though certainly constitutional, and strictly just. It was impossible to eradicate the disorder by any thing less than a dissolution of those bodies, with whose existence its roots were so intertwined as to be inseparable from it, leaving their elements to form new and less heterogeneous combinations. Though deprived of Presbyterial organization, the Presbyterian parts, were, not excluded from the church, provision being made for them, by allowing them to attach themselves to the nearest presbytery.

It is said there is not sufficient evidence to establish the fact, that the exscinded synods had actually been constituted on the plan of union, in order to have given the assembly even legislative jurisdiction. The testimony of the Rev. Mr. Squier, however, shows that in some of the three which were within the state of New York, congregations were sometimes constituted without elders; and the synod of the Western Reserve, when charged with delinquency on that head, instead of denying the fact, promptly pointed to the plan of union for its justification. But what matters it whether the fact were actually what the assembly supposed it would be? If that body proceeded in good faith, the validity of its enactment cannot depend on the justness of its conclusion. We have, as already remarked, no authority to re-judge its judgments on their merits; and this principle was asserted with conclusive force by the presiding judge who tried the cause. Upon an objection made to an inquiry into the composition of the presbytery of Medina, it was ruled that " with the reasons for the proceedings of 1837, (the act of excision,) we have nothing to do. We are to determine only what was done: the reasons of those who did it are immaterial. If the acts complained of were within the jurisdiction of the assembly, their decision must be final, though they decided wrong." This was predicated of judicial jurisdiction, but the principle is necessarily as applicable to jurisdiction for purposes of legislation. I cite the passage, however, to show that after a successful resistance to the introduction of evidence of the fact, it lies not with the relators to allege the want of it.

If then the synods in question were constitutionally dissolved, the presbyteries of which they had been composed, were, at least, for purposes of representation, dissolved along with them; for no presbytery can be in connexion with the General Assembly, unless it be at the same time subordinate to a synod, also in connexion with it; because an appeal from its judgment can reach the tribunal of the last resort only through that channel. It is immaterial that the presbyteries are the electors; a synod is a part of the machinery which is indispensable to the existence of every branch of the church.

It .appears, therefore, that the commissioners from the exscinded synods, were not entitled to seats in the assembly, and that their names were properly excluded from the roll.

The inquiry might be rested here; for if there were no colour of right in them there was no colour of right in the adversary proceedings which were founded on their exclusion. But even if their title were clear, the refusal of an appeal from the decision of the moderator would be no ground for the degradation of the officer at the call of a minority; nor could it impose on the majority an obligation to vote on the question put unofficially, and out of the usual course. To all questions put by the established organ, it is the duty of every member to respond, or be counted with the greater number, because he is supposed to have assented beforehand to the process pre-established to ascertain the general will; but the rule of implied assent is certainly inapplicable to a measure which, when justifiable even by extreme necessity, is essentially revolutionary, and based on no pre-established process of ascertainment whatever.

To apply it to an extreme case of inorganic action, as was done here, might work the degradation of any presiding officer in our legislative halls, by the motion and actual vote of a single member, sustained by the constructive votes of all the rest; and though such an enterprise may never be attempted, it shows the danger of resorting to a conventional rule, when the body is to be resolved into its original elements, and its rules and conventions to be superseded by the very motion. For this reason, the choice of a moderator to supplant the officer in the chair, even if he were removable at the pleasure of the commissioners, would seem to have been unconstitutional.

But he was not removable by them, because he had not derived his office from them, nor was he answerable to them for the use of his power. He was not *their* moderator. He was the mechanical instrument of their organization; and till that was accomplished, they were subject to his rule—not he to theirs. They were chosen by the authority of his mandate, and with the power of self organization, only in the event of his absence at the opening of the session. Corporeally present but refusing to perform his function, he might be deemed constructively absent, for constitutional purposes, insomuch that the commissioners might proceed to the choice of a substitute without him; but not if he had entered on the performance of his task; and the reason is that the decision of such questions as were prematurely pressed here, is proper for the decision of the body when prepared for organic action, which it cannot be before it is fully constituted and under the presidency of its own moderator, the moderator of the preceding session being *functus officio*. There can be no occasion for its action sooner; for though the commissioners are necessarily called upon to vote for their moderator, their action is not organic but individual. Doctor Mason's motion and appeal,

though the clerks had reported the roll, were premature; for though it is declared in the twelfth chapter of the Form of Government, that no commissioner shall deliberate or vote before his name shall have been enrolled, it follows not that the capacity, consummated by enrollment was expected to be exercised during any part of the process of organization, but the choice of a moderator; and moreover, the provision may have been intended for the case of a commissioner appearing for the first time, when the house was constituted.

Many instances may doubtless be found among the minutes, of motions entertained previously; for our public bodies, whether legislative or judicial, secular or ecclesiastical, are too prone to forget the golden precept,—" Let all things be done decently and in order." But these are merely instances of irregularity which have passed, *sub silentio*, and which cannot change a rule of positive enactment. It seems then that an appeal from the decision of the moderator did not lie; and that he incurred no penalty by the disallowance of it. The title of the exscinded commissioners, could be determined only by the action of the house, which could not be had before its organization was complete; and in the meantime he was bound, as the executive instrument of the preceding assembly, to put its ordinance into execution: for to the actual assembly, and not to the moderator of the preceding one, it belonged to repeal it.

It would be decisive, however, that the motion, as it was proposed, purported not to be in fact a question of degradation for the disallowance of an appeal, but one of new and independent organization. It was, ostensibly as well as actually, a measure of transcendental power, whose purpose was to treat the ordinance of the preceding assembly as a nullity, and its moderator as a nonentity. It had been prepared for the event avowedly before the meeting. The witnesses concur that it was propounded as a measure of original organization transcending the customary order; and not as a recourse to the *ultima ratio* for a specific violation of it. The ground of the motion, as it was opened by the mover, was not the disallowance of an appeal, which alone could afford a pretext of forfeiture, but the fact of exclusion. To affect silent members with an implication of assent, however, the ground of the motion and nature of the question must be so explicitly put before them as to prevent misconception or mistake; and the remarks that heralded the question in this instance, pointed at, not a removal of the presiding incumbent, but a separate organization, to be accomplished with the least practicable interruption of the business in hand: and if they indicated any thing else, they were deceptive. The measure was proposed not as that of the body, but as the measure of a party; and the cause assigned for not having proposed it elsewhere, was that individuals of the party had been instructed by counsel that the purpose of it could not be legally accomplished in any other place.

(The Commonwealth *v.* Green.)

No witness speaks of a motion to degrade; and the rapidity of the process by which the choice of a substitute, not a successor, was effected, left no space for reflection or debate. Now, before the passive commissioners could be affected by acquiescence implied from their silence, it ought to have appeared that they were apprised of what was going on; but it appears that even an attentive ear witness was unable to understand what was done. The whole scene was one of unprecedented haste, insomuch that it is still a matter of doubt how the questions were put. Now, though these facts were fairly put to the jury, it is impossible not to see, that the verdict is, in this respect, manifestly against the current of the evidence.

Other corroborative views have been suggested; but it is difficult to compress a decision of the leading points in this case into the old fashioned limits of a judicial opinion. The preceding observations, however, are deemed enough to show the grounds on which we hold that the assembly which met in the First Presbyterian Church was not the legitimate successor of the assembly of 1837; and that the defendants are not guilty of the usurpation with which they are charged. The rule for a new trial must be made absolute.

ROGERS, J.—After the patient and impartial investigation, by me, of this cause at Nisi Prius, and in bank, I have nothing at this time to add, except that my opinion remains unchanged on all the points ruled at the trial. This explanation is deemed requisite in justice to myself, and because it has become necessary (in a case in some respects without precedent, and presenting some extraordinary features) to prevent misapprehension and misrepresentation.

Rule absolute.